_____

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

_____

**SHANIECE MATHEWS, as guardian** *ad litem* **and on behalf of her son, D. W.,**

Plaintiff-Appellant/Cross-Appellee,

v.

**STATE OF ILLINOIS,** *et al.*,

Defendants-Appellees/Cross-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Illinois,
Case No. 1:18-cv-06675
The Honorable Joan B. Gottschal

_____

## OPENING BRIEF OF
## PLAINTIFF-APPELLANT/CROSS-APPELLEE

_____

DESPRES, SCHWARTZ, & GEOGHEGAN, LTD.
Thomas H. Geoghegan
Will W. Bloom
77 West Washington Street
Suite 711
Chicago, Illinois 60602
(312) 372-2511
tgeoghegan@dsgchicago.com

POMERANTZ, L.L.P.
Patrick V. Dahlstrom
10 South La Salle Street
Suite 3505
Chicago, Illinois 60603
(312) 377-1181
pdahlstrom@pomlaw.com

*Attorneys for Plaintiff-Appellant and the Class*

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2182

Short Caption: Mathews v. State of Illinois, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Plaintiff-Appellant Shaniece Mathews

The only new information on this form is counsel's appearance for Plaintiff-Appellant.

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Despres, Schwartz, & Geoghegan, Ltd.

(3)     If the party, amicus or intervenor is a corporation:

i)     Identify all its parent corporations, if any; and

n/a

ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

n/a

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Thomas H. Geoghegan     Date: 8/4/2024

Attorney's Printed Name:  Thomas H. Geoghegan

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** ☑     **No** ☐

Address:  77 W. Washington St., Suite 711, Chicago, IL 60602

Phone Number:  (312) 372-2511     Fax Number:  (312) 971-5634

E-Mail Address: tgeoghegan@dsgchicago.com, admin@dsgchicago.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2182

Short Caption: Mathews v. State of Illinois, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Plaintiff-Appellant Shaniece Mathews

    The only new information on this form is counsel's appearance for Plaintiff-Appellant.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Despres, Schwartz, & Geoghegan, Ltd.

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        n/a

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    n/a

Attorney's Signature: /s/ Will W. Bloom    Date: 8/4/2024

Attorney's Printed Name:  Will W. Bloom

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: 77 W. Washington St., Suite 711, Chicago, IL 60602

Phone Number: (312) 372-2511    Fax Number: (312) 971-5634

E-Mail Address: wbloom@dsgchicago.com, admin@dsgchicago.com

rev. 12/19 AK

Save As    Clear Form

### APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-2182

Short Caption: Mathews v. State of Illinois

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Shanice Mathews

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Despres, Schwartz & Geoghegan, Ltd

Pomerantz LLP

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature:    Date: 10/06/2025

Attorney's Printed Name: Patrick V. Dahlstrom

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: Ten South La Salle St., Suite 3505

Chicago, IL 60603

Phone Number: 312-377-1181    Fax Number: 312-377-1184

E-Mail Address: pdahlstrom@pomlaw.com

rev. 12/19 AK

# TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENTS.................................................i

TABLE OF CONTENTS.........................................................................................iv

TABLE OF AUTHORITIES ..................................................................................vi

JURISDICTIONAL STATEMENT .......................................................................1

STATEMENT OF THE ISSUES.............................................................................2

STATEMENT OF CASE.........................................................................................3

STANDARD OF REVIEW ....................................................................................11

SUMMARY OF ARGUMENT.............................................................................12

ARGUMENT ..........................................................................................................17

    I.  The ISP has the authority to require gun dealers to maintain records to show that they are effectively checking for straw purchases such that violations of 430 ILCS 68/5-85(a) have not occurred. .................................................................................17

    II.  The ISP has discretionary authority to deny renewal of a license and may do so when the dealers fail to submit records of some kind to show they are following the practices in which the ISP is supposed to train them. ..............................20

    III. Plaintiff has standing to sue under the Rehabilitation Act of 1973 and the Illinois Civil Rights Act of 2003. ...........................................25

        A.  Plaintiff has pled a case or controversy pursuant to *Lujan*. ............................................................................................25

        B.  Plaintiff has adequately alleged traceability and redressability to support standing under Section 504 and the ICRA....................................................................................26

CONCLUSION........................................................................................................29

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE LIMITATIONS ................................................................................. 31

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(a) and (b) ................................................................................................................. 32

# TABLE OF AUTHORITIES

## Cases

*Abramski v. United States*,
573 U.S. 169 (2014) ........................................................................5-6

*Allen v. Wright*,
468 U.S. 737 (1985)........................................................................26-27

*Arreola v. Godinez*,
546 F.3d 788 (7th Cir. 2008) ............................................................ 11

*Church of Scientology of Cal. v. United States*,
506 U.S. 9 (1992) ............................................................................. 26

*Eastman Kodak Co. v. Fair Employment Practices Comm'n*,
86 Ill. 2d 60, 426 N.E. 2d 877 (1981) .............................................23-24

*Ezekiel v. Michel*,
66 F.3d 894 (7th Cir. 1995) ............................................................... 11

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ......................................................................... 26

*Lujan v. Defs. Of Wildlife*,
504 U.S. 555 (2016) .......................................................................12, 25-26

*National Shooting Sports Foundation Inc., et al., v. Letitia James*,
Brief of State of Illinois for *Amici Curiae*, United States Court of
Appeals for the Second Circuit, 22-1374 (2d. Cir. Jan. 13, 2023).............. 9, 27

*Pennell v. City of San Jose*,
485 U.S. 1, 7 (1988) ......................................................................... 11

*People v. Carpenter*,
385 Ill. App. 3d 156, 895 N.E.2d 24, 324 Ill. Dec. 24 (2008)............................ 24

*People v. Henry*,
398 Ill. App. 3d 1019 .......................................................................23-24

*United States v. Johnson,*
   No. 22 CR 53, Plea Agreement, (N.D. Ill. July 1, 2022), ECF 22 ....................7

*United States v. Kerner,*
   895 F.2d 1159 (7th Cir. 1990) ...........................................................11

*Warth v. Seldin,*
   422 U.S. 490 (1975) ....................................................................11-12

*Washington v. Indian High Sch. Ath. Ass'n*
   181 F.3d 840 (7th Cir. 1999) .............................................................16

*Winkler v. Gates,*
   481 F.3d 977 (7th Cir. 2007) .............................................................11

*Wisconsin Right to Life, Inc. v. Schober,*
   366 F.3d 485 (7th Cir. 2004) .............................................................11

**Statutes**

18 U.S.C. § 922 ............................................................................17

28 U.S.C. § 1291 .............................................................................1

28 U.S.C. § 1331 .............................................................................1

28 U.S.C. § 1334 .............................................................................1

28 U.S.C. § 1367 .............................................................................1

29 U.S.C. § 794 .......................................................................*passim*

27 C.F.R. 4 § 78.128 .......................................................................17

Fed. R. App. P. 4(a)(1)(A) .................................................................1

20 ILCS 2605 ..........................................................................*passim*

430 ILCS 68/5 .........................................................................*passim*

720 ILCS 5/24 .............................................................................15

740 ILCS 23/5 ....................................................................................... *passim*

815 ILCS 505/2DDDD.......................................................................... *passim*

Illinois Admin. Code tit. 20, pt. 1232 ......................................................... 18

**Additional Authorities**

Bill Hutchinson, Memorial Day Weekend Mayhem Leaves 53 Shot, 11 Fatally, in Chicago, ABC News (May 30, 2023, 6:30 PM). https://abcnews.go.com/US/53-people-shot-11-fatally-violent-memorial-day/story?id=99691001 ..................................................................... 3

Bureau of Alcohol, Tobacco, Firearms and Explosives. National Firearms Commerce and Trafficking Assessment (NFCTA): Firearms Trafficking Investigations - Volume Three | Bureau of Alcohol, Tobacco, Firearms and Explosives. (n.d.). https://www.atf.gov/firearms/national-firearms-commerce-and-trafficking-assessment-nfcta-firearms-trafficking......................................................................................... 6

City of Chicago, Mayor's Office of Violence Reduction (2025). https://www.chicago.gov/city/en/sites/vrd/home.html................................. 3, 5

City of Chicago, Office of the Mayor & Chicago Police Department (2017). Gun Trace Report. https://www.chicago.gov/content/dam/city/depts/mayor/Press%20Room/Press%20Releases/2017/October/GTR2017.pdf.............................................................................................. 3

Cindy Hernandez and Kade Heather, 7-year-old boy fatally shot outside his Near West Side home, CHICAGO SUN-TIMES (June 18, 2024, 8:49 PM). https://chicago.suntimes.com/crime/2024/06/18/7-year-old-shot-killed-near-west-side-crime-guns-gunshots-assault-rifles-city-hall-violence-probe .................................................................................. 4

Daley, *Where Gun Stores Open, Gun Homicides Increase, More oversight of dealers and investment in impoverished communities are key to reducing violence, experts say*, Scientific American, Nov. 3, 2021, https://www.scientificamerican.com/article/where-gun-stores-open-gun-homicides-increase/ ...................................................................... 6

Daniel W. Webster, *et al.*, *Effects of a Gun Dealer's Change in Sales Practices on the Supply of Guns to Criminals*, 83 J. of Urban Health 778, 778-87 (2006) .................................................................................................... 28

Daniel W. Webster, *et al.*, *Effects of Undercover Police Stings of Gun Dealers on the Supply of New Guns to Criminals*, 12 Inj. Prevention 225, 225-30 (2006) .................................................................................................... 28

Emily Shapiro, 7-year-old boy shot dead outside his front door in Chicago: 'Unbearable,' ABC News (June 20, 2024, 9:53 AM). https://abcnews.go.com/US/7-year-boy-shot-dead-front-door-chicago/story?id=111272187 .................................................................... 4

Phillip Cook, *et al.*, *Some Sources of Crime Guns in Chicago; Dirty Dealers, Straw Purchasers, and Traffickers*, 104 J. of Crim. L. & Criminology 717, 715 (2015) .................................................................................................... 28

Press Release, U.S. Attorney's Office, Northern District of Illinois, Man Indicted for Allegedly Straw Purchasing 27 Handguns From Stores in the Chicago Suburbs. (2022, February 3). https://www.justice.gov/usao-ndil/pr/man-indicted-allegedly-straw-purchasing-27-handguns-stores-chicago-suburbs-0 ....................................................... 6-7

Press Release, U.S. Department of Health and Human Services, U.S. Surgeon General Issues Advisory on the Public Health Crisis of Firearm Violence in the United States (June 25, 2024). https://www.hhs.gov/about/news/2024/06/25/us-surgeon-general-issues-advisory-public-health-crisis-firearm-violence-united-states.html ............................................................................................. 4-5

Rachana Bhowmik, *Aiming for Accountability: How City Lawsuits Can Help Reform an Irresponsible Gun Industry*, 11 J.L. & Pol'y 67, 108-09 (2002) ............................................................................................... 27-28

Vi Nguyen, Loved ones remember life of 7-year-old shot to death on Near West Side, NBC Chicago (June 19, 2024, 8:20 PM). https://www.nbcchicago.com/news/local/loved-ones-remember-life-of-7-year-old-shot-to-death-on-near-west-side/3468112/ .................................. 4

## JURISDICTIONAL STATEMENT

The District Court had general federal question jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1334, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over related state law claims.

This Court has jurisdiction over Plaintiff-Appellant's appeal pursuant to 28 U.S.C. § 1291 and Fed. R. App. P. 4(a)(1)(A). The District Court issued an order dismissing this case on standing on June 13, 2025. *See* A31. Plaintiff-Appellant filed a timely notice of appeal on July 11, 2025. *See* A41.

## STATEMENT OF THE ISSUES

1.      Whether the District Court erred in holding that the Illinois State Police ("ISP") does not have the authority under Illinois law, including the Firearm Dealer License Certification Act ("FDLCA"), 430 ILCS 68/5-1, *et seq.*, as well as ISP's own organic statutory authority, 20 ILCS 2605-15, to require licensed gun dealers to use the Brady Checklist, or a variant thereof, to show whether those dealers have been following the responsible business.

2.      Whether the ISP has discretionary authority to deny re-licensing to dealers that fail to follow responsible business practices, in violation of the Firearm Industry Responsibility Act ("FIRA"), 815 ILCS 505/2DDDD.

3.      Whether Plaintiff-Appellant has standing to have the ISP exercise such discretionary authority as Plaintiff-Appellant has shown that its exercise is likely to significantly reduce the level of gun violence to which Plaintiff and other Black children in the highest crime Chicago neighborhoods are now exposed.

## STATEMENT OF CASE

The prevalence of gun violence on the streets of Chicago is well-known to everyone who lives in the city. *See, e.g.,* Bill Hutchinson, Memorial Day Weekend Mayhem Leaves 53 Shot, 11 Fatally, in Chicago, ABC News (May 30, 2023, 6:30 PM). https://abcnews.go.com/US/53-people-shot-11-fatally-violent-memorial-day/story?id=99691001. Such gun violence has been well documented by the Chicago Police Department and the University of Chicago Crime Lab for many years. *See, e.g.,* City of Chicago, Office of the Mayor & Chicago Police Department (2017). Gun Trace Report. https://www.chicago.gov/content/dam/city/depts/mayor/Press%20Room/Press%20Releases/2017/October/GTR2017.pdf; Gun Trace Report 2017, U. Chi. Crime Lab. https://crimelab.uchicago.edu/resources/gun-trace-report/.

More alarming is that since this action was initially filed in 2018, more than 2,267 children have been recorded as shooting victims of gun violence, including 319 fatally. *See* City of Chicago, Mayor's Office of Violence Reduction (2025). https://www.chicago.gov/city/en/sites/vrd/home.html. The statistics reported by the Chicago Mayor's Office show that gun violence is disproportionately concentrated in Chicago's African American neighborhoods, with Black Chicagoans accounting for 77.1% of fatal and non-fatal shooting victims since this action was filed in late 2018. *Id.*

The impact of gun violence inflicts psychological and emotional damage beyond those who are shot. The family and friends of the victims also suffer. Children are terrorized by gun violence and the fear of being shot. *See* Cindy Hernandez and Kade Heather, 7-year-old boy fatally shot outside his Near West Side home, Chicago Sun-Times (June 18, 2024, 8:49 PM). https://chicago.suntimes.com/crime/2024/06/18/7-year-old-shot-killed-near-west-side-crime-guns-gunshots-assault-rifles-city-hall-violence-probe; Emily Shapiro, 7-year-old boy shot dead outside his front door in Chicago: 'Unbearable,' ABC NEWS (June 20, 2024, 9:53 AM). https://abcnews.go.com/US/7-year-boy-shot-dead-front-door-chicago/story?id=111272187. *See also* Vi Nguyen, Loved ones remember life of 7-year-old shot to death on Near West Side, NBC CHICAGO (June 19, 2024, 8:20 PM). https://www.nbcchicago.com/news/local/loved-ones-remember-life-of-7-year-old-shot-to-death-on-near-west-side/3468112/.

Such is the reality of Plaintiff, D.W., and every other child who is subject to repeated shootings and gunshots in his predominantly African American Chicago neighborhood of West Garfield Park.

As the former U.S. Surgeon General and Vice Admiral Vivek Murthy has stated, "Firearm violence is an urgent public health crisis that has led to loss of life, unimaginable pain and profound grief for too many Americans." *See* Press Release, U.S. Department of Health and Human Services, U.S. Surgeon General

Issues Advisory on the Public Health Crisis of Firearm Violence in the United States (June 25, 2024). https://www.hhs.gov/about/news/2024/06/25/us-surgeon-general-issues-advisory-public-health-crisis-firearm-violence-united-states.html. Amidst the pain and grief of all who are subject to gun violence, the Surgeon General noted, "Black youth accounted for about half of all firearm deaths among all youth, despite making up only 14% of the U.S. youth population." *Id.*

When Plaintiff D.W. was in the fourth grade, his cousin was shot and killed. Fourth Amended Class Action Complaint (hereinafter, "FAC") at ¶ 12. At the time, D.W. was just blocks from the shooting. A month and a half later, another one of his cousins shot and killed himself with a handgun. In the three years following the murder of D.W.'s cousin, more than ten shootings occurred within a four-block radius of his home in West Garfield Park. *Id.* Since his complaint was filed in October 2018, the City of Chicago has recorded over 1,000 gunshot victims in West Garfield Park. *See* City of Chicago, Mayor's Office of Violence Reduction (2025). https://www.chicago.gov/city/en/sites/vrd/home.html. Eighty-six (86) of those victims in D.W.'s neighborhood were juveniles, including 10 juvenile shooting fatalities. *Id.*

One of the sources of the flow of guns into Chicago is gun sales via straw purchases, *i.e.,* a gun sold to "a person who buys a gun on someone else's behalf while

falsely claiming that it is for himself." *Abramski v. United States,* 573 U.S. 169, 171-162 (2014). Straw purchases may be intended specifically for a particular individual or purchased to resell to someone who cannot or chooses not to purchase the guns themselves. The federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (the "ATF") has reported for decades that the legal inventories of retail firearms dealers are a dominant source of weapons for illegal traffickers, who acquire firearms through theft or straw purchases. *See* Bureau of Alcohol, Tobacco, Firearms and Explosives. National Firearms Commerce and Trafficking Assessment (NFCTA): Firearms Trafficking Investigations - Volume Three | Bureau of Alcohol, Tobacco, Firearms and Explosives. (n.d.). https://www.atf.gov/firearms/national-firearms-commerce-and-trafficking-assessment-nfcta-firearms-trafficking.

A former enforcer for a major Chicago street gang explained that "individuals that have a right to go buy a gun" will go to a gun store in "one of the suburbs," buy a gun, and bring it back to the gang in the city. *See* Daley, *Where Gun Stores Open, Gun Homicides Increase, More oversight of dealers and investment in impoverished communities are key to reducing violence, experts say*, Scientific American, Nov. 3, 2021, https://www.scientificamerican.com/article/where-gun-stores-open-gun-homicides-increase/.

In February 2022, over three years after the complaint was filed in this action, the United States Department of Justice ("DOJ") issued a press release announcing

that a person was indicted for "making a false and fictitious statement in connection with the acquisition" of twenty-seven (27) guns, *i.e.*, straw purchases, from gun dealers in the Chicago suburbs. Press Release, U.S. Attorney's Office, Northern District of Illinois, Man Indicted for Allegedly Straw Purchasing 27 Handguns From Stores in the Chicago Suburbs (February 3, 2022). https://www.justice.gov/usao-ndil/pr/man-indicted-allegedly-straw-purchasing-27-handguns-stores-chicago-suburbs-0.[1]

Straw purchases are illegal under both federal and state law, and halting straw purchases is the first line of defense in preventing the diversion of legal guns to the illegal market. Accordingly, the responsible business practices of licensed dealers that identify and prevent a straw purchase play a critical role in the prevention of illegally purchased straw guns from flowing onto the streets of Chicago and the neighborhood where D.W. lives.

To guide gun dealers in using responsible business practices, the Brady Center to Prevent Gun Violence developed a checklist of questions and observations for use by gun dealers to help them identify and refuse to allow straw purchases or

---

[1] The indicted defendant ultimately pleaded guilty to illegally making 27 straw purchases from 4 suburban Chicago gun dealers over twelve months. *See United States v. Johnson*, No. 22 CR 53, Plea Agreement, (N.D. Ill. July 1, 2022), ECF 22. In one 22-day period, he purchased six high-powered handguns from one dealer, Shot Point Blank of Hodgkins, IL. *Id.* at 4. A little over a month later, he purchased two more handguns from the same gun dealer. *Id.* at 5.

straw sales, known as the Brady Checklist.[2] The Brady Checklist is based on recommended practices documented in an ATF video made in conjunction with the National Shooting Sports Foundation ("NSSF"), a gun industry trade association, entitled "Don't Lie for the Other Guy."

To be relicensed as a gun dealer in Illinois today, other than paying an annual fee, a gun dealer only needs to check a box on the relicensing form indicating that its employees have viewed the ATF/NSSF video regarding straw sales. The Illinois State Police (the "State Police" or "ISP") has the legal authority and duty to enforce the law against gun dealers engaging in straw purchases, but the ISP does not require that gun dealers do anything to verify that they are not engaging in straw sales. As the DOJ's indictment referenced above evinces, straw sales from suburban Chicago gun dealers continue.

The ISP has the legal authority and duty to take actions to reduce straw purchases under the Firearm Dealer License Certification Act, 430 ILCS 68/5, *et seq.*, ("FDLCA") but instead has abandoned its duty and does not require gun dealers to do anything to ensure that responsible business practices are employed when actually selling guns. Indeed, the ISP does nothing to require gun dealers to follow

---

[2] The Brady Center to Prevent Gun Violence is a nonprofit organization that advocates for gun control and against gun violence. It was named after former White House press secretary Jim Brady, who was shot and permanently disabled during the assassination attempt on President Ronald Reagan in 1981.

responsible business practices when they sell a gun or to verify as much when seeking re-licensing, which would prevent straw-purchased guns from flowing into neighborhoods where D.W. and other impacted children live. This is so, even though it is well documented that, as Attorney General Raoul has proffered in other litigation,[3] reducing straw sales would reduce the level of gun violence to which D.W. and other children are exposed daily and cause them trauma or renew the trauma they experience from exposure to gun violence.

The complaint herein was brought on behalf of D.W. and a class of African American children traumatized by Chicago's endemic gun violence. The lawsuit seeks to require the State Police to enforce State law by having gun dealers use the Brady Checklist, or a variation thereof, to ensure that gun dealers employ responsible business practices when they sell a gun, and, thereby, prevent the illegal practice of straw purchases from occurring. Licensed gun dealers operating in Illinois were responsible for selling 40% of Chicago's "crime guns" — or guns recovered by law enforcement in connection with crime. Most of these guns are sold by licensed dealers operating in suburbs near Chicago, with only seven dealers responsible for selling the majority of Chicago's crime guns attributed to Illinois dealers.

---

[3] *See* Brief of State of Illinois for *Amici Curiae, National Shooting Sports Foundation Inc., et al., v. Letitia James*, United States Court of Appeals for the Second Circuit, 22-1374 (2d. Cir. Jan. 13, 2023); DKT. 178, FAC at ¶¶ 73-9.

Defendant ISP's failure to take any action to reduce the level of illegal gun violence from straw purchases is an unlawful denial of a reasonable accommodation to the needs of Plaintiff D.W. and other traumatized children. The failure to accommodate is a prohibited form of discrimination under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C § 794. Indeed, it is further illegal under Section 5(a)(2) of the Illinois Civil Rights Act of 2003 ("ICRA"), 740 ILCS 23/5(a)(2). In violation of that Act, as well as in failing to protect Black children per their authority under the FDLCA, Defendant is using "criteria and methods of administration" that serve no valid public purpose and, in effect, subject Black children like Plaintiff D.W. to discrimination based on race.

Contrary to established precedent, the District Court improperly held that the ISP does not have the authority to require gun dealers to use the Brady Checklist. Furthermore, the District Court erred in holding that the Plaintiff was seeking to require a mandatory non-renewal of a gun dealer's license. Order at 4-5 (A34-A35). On the contrary, Plaintiff argued in its papers and in open court that the ISP retained discretion in deciding whether to renew a license. Indeed, Plaintiff did not seek anything beyond having gun dealers use the Brady Checklist during a gun sale and never addressed the ultimate decision regarding whether to reissue a gun dealer's license. Based on its misconstruction, however, the District Court deemed the State Police lacked the authority to promulgate the use of the Brady Checklist

and, therefore, held that Plaintiff's relief would not redress its concrete and particularized injury. Order at 8 (A38). Accordingly, the District Court held that Plaintiff lacked standing to pursue the injunctive relief it sought, *i.e.,* having gun dealers use the Brady Checklist (or a variant thereof) to ensure that gun dealers employ responsible business practices when they sell a gun.

## STANDARD OF REVIEW

The Court reviews the District Court's dismissal for a lack of standing on a *de novo* basis: "Whether a party has standing to bring a 'case or controversy' before the court is a question of law that this court reviews *de novo*." *Arreola v. Godinez,* 546 F.3d 788, 794 (7th Cir. 2008) (citing *Winkler v. Gates,* 481 F.3d 977, 982 (7th Cir. 2007) (quoting *Wisconsin Right to Life, Inc. v. Schober*, 366 F.3d 485, 489 (7th Cir. 2004))).

For purposes of review, the Court should "draw reasonable inferences in favor of the plaintiff." *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995). *See also United States v. Kerner*, 895 F.2d 1159, 1162 n. 2 (7th Cir. 1990) (citing *Pennell v. City of San Jose*, 485 U.S. 1, 7 (1988), (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975))) (holding courts should "'accept as true all material allegations of the complaint, and . . . construe the complaint in favor of the complaining party'").

## SUMMARY OF ARGUMENT

The District Court held that Plaintiff lacked standing to pursue an injunction to have the ISP enforce regulations based on three elements the court cited from *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560 (2016). Order at 7 (A37). With respect to the first element, injury in fact, the District Court held that the Plaintiff's "fourth amended complaint's allegations mirror those this court held sufficient to allege a concrete and particularized injury in fact in the third amended complaint." Order a 7 (A37).

With respect to the next two elements, causation and redressability, the District Court held that the Plaintiff had not satisfied those elements because the ISP does not have the "authority to promulgate the regulations" that the Plaintiff proposes. Order at 8 (A38). The District Court erred, however, in construing what Plaintiff was proposing. The relief is *not* that the ISP *must* deny the re-licensing of a dealer under the FDLCA for failure to follow responsible business practices—that is, for failure to use the standard procedures in which the State Police must train dealers under 430 ILCS 68/5-30. Plaintiff has never argued for such relief.

Rather as set out in the relief quoted at the opening of the District Court's opinion, Plaintiff seeks to have the State Police produce digital or paper records that show at the time of sale, the dealer is going through the check list (the so called Brady checklist or something similar) and be able to produce that record to ISP at

the time of relicensing. Plaintiff has never asked the court to enjoin the ISP to deny the renewal of the license, as Illinois law is clear that the ISP *may, i.e.,* has the discretion to deny re-licensing if a gun dealer is not following the reasonable business practices as required by the state law known as FIRA, 815 ILCS 505/2DDDD, and which the ISP is obligated to train the dealers under FDLCA, 430 ILCS 68/5-30. That provision now is only superficially enforced by the ISP, with no attempt to prevent straw purchases from occurring, in part, because ISP denies it has the authority to require the dealers, much less affirmatively and explicitly advise them, that dealers who cannot demonstrate that they use responsible business practices may not have their license renews. The result of this policy by the ISP is to render the FDLCA ineffective in requiring responsible business practices.

Of course, the use of the ISP's authority to deny a license renewal for failure to follow responsible business practices is discretionary under the FDLCA; however, the ISP claims that no such authority exists or can ever be exercised. The Plaintiff-Appellant argues to the contrary that ISP not only has the authority, but in the real world, in the concrete circumstances in which the Plaintiff and other Black children in the class are living, the ISP has an obligation to exercise that authority to the extent that it will "significantly reduce" the level of violence to which the Plaintiff and Black children are exposed. This obligation arises under two laws, first under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, as it is a

reasonable accommodation by the ISP to the special needs of children already traumatized and disabled in the statutory definition by day-in-day-out exposure to violence. Second, it arises under Section 5(a)(2) the Illinois Civil Rights Act of 2003, 740 ILCS 23/5(a)(2), because the disavowal and failure to use the statutory authority under the FDLCA is a "method of administration," even if discretionary, that is unlawful because it has such a severe racial impact on the Plaintiff and other Black children and such non-enforcement serves no legitimate purpose.

The ISP must use that authority when it will significantly reduce the level of gun violence to which the Plaintiff and other children in the proposed class are exposed. Under Section 504 of the Rehabilitation Act, lowering the level of gun violence in their neighborhoods is the "reasonable accommodation" that a state or local unit of government *must* provide, especially where, like here, the burden or expense to ISP is modest at most for the huge benefit conferred on these disabled and traumatized.

Likewise, under Section 5(a)(2) of the Illinois Civil Rights Act of 2003, 740 ILCS 23/5(a)(2), there is an obligation on the ISP to use "methods of administration," *i.e.*, to exercise State discretionary authority in a certain manner, when the ISP's failure to do so imposes enormous harm on a racially isolated population of Black children. It should be noted that the ISP has consistently sought a ruling on the merits in federal court regarding the ICRA claim, which specifically sets out a

policy favoring the resolution of these claims in both federal and state courts under the supplemental jurisdiction of federal courts. *See* ICRA, Section 5(b).

Plaintiff well understood that the authority vested in the ISP was not a binary either/or, *i.e.*, either renew or not renew, as the court presumed. Illinois law clearly states that the ISP has multiple options in its discretion in dealing with relicensing, and "may refuse to renew or restore, or may reprimand, place on probation, suspend, revoke, or take other disciplinary or non-disciplinary action against any licensee, and may impose a fine commensurate with the severity of the violation," for, *inter alia*, "(1) Violations of this Act, or any act applicable to the sale or transfer of firearms." 430 ILCS 68/5(a). Thus, the ISP may not refuse to renew a license and still, in its discretion, take some other authorized action with a gun dealer to ensure closer scrutiny to prevent straw sales.

The use of the checklist was not proffered as a new criterion to 430 ILCS 68/5-85(a), as the District Court stated (*see* Order at 3 (A33)), but a means to assist a gun dealer in preventing a violation of a "law applicable to the sale or transfer of firearms," *i.e.*, to prevent a violation pursuant to 720 ILCS 5/24-3.5(b) outlawing straw purchases in Illinois. The purpose of using the checklist is preventative or prophylactic—to halt straw sales and keep illegal guns off the streets of Chicago's neighborhoods, where D.W. and other children are being traumatized almost daily by gunfire and shootings. The reason one uses responsible business practices is to

identify and prevent straw sales from ever occurring. The authority and duty of the ISP is to regulate gun dealers and require them to use responsible business practices to keep illegal guns off the streets in the first place.

The ISP's refusal to act—its abandonment of authority and duty under state law—and require gun dealers to employ responsible business practices that would lead to a reduction in the levels of gun violence in Chicago, denies D.W. and other children in the class a reasonable accommodation for their disabilities caused by gun violence. By abandoning and failing to use its regulatory power, the ISP has unlawfully refused a reasonable accommodation to D.W. and the class in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. *See Washington v. Indian High Sch. Ath. Ass'n,* 181 F.3d 840, 846-7 (7th Cir. 1999) (recognizing reasonable accommodation claims and treating ADA and Section 504 as similar). Moreover, ISP's continued refusal to act aggravates their disabilities due to cascading gun violence in their neighborhoods across Chicago.

Based on the errant premise that Plaintiff wanted the court to enjoin the ISP's discretionary authority, the District Court deemed the ISP lacked the authority to promulgate the use of the Brady Checklist and, therefore, held that Plaintiff lacked standing to pursue the injunctive relief of having the ISP (1) require dealers produce records showing they use the Brady Checklist or a similar "checklist" drawn from practices in which the ISP must train dealers, and (2) notify the dealers as

part of the relicensing process and ISP's required training that relicensing can be denied for failure to follow responsible business practices.

## ARGUMENT

Under both Illinois state law and federal law, it is illegal for a gun dealer to engage in a straw sale if the gun dealer knows or should know that the transaction constitutes a straw sale. *See* 18 U.S.C. § 922(a)(6); 27 C.F.R. 4 § 78.128; 430 ILCS 68/5-85(a). The Illinois Firearm Industry Responsibility Act ("FIRA") makes it unlawful for gun dealers to fail to use "reasonable procedures, safeguards, and business practices that are designed to: (A) prevent the sale… to a straw purchaser…" *See* 815 ILCS 505/2DDDD(b)(1)(a). The Illinois state legislature has designated the ISP with the authority and responsibility to enforce the terms of FIRA.

**I. The ISP has the authority to require gun dealers to maintain records to show that they are effectively checking for straw purchases such that violations of 430 ILCS 68/5-85(a) have not occurred.**

The District Court erred in holding that under the Firearm Dealer Licensing Certification Act ("FDLCA"), 430 ILCS 68/5-60, the ISP has no rule-making authority to specify anything the dealers must show for license renewal or condition the renewal on production of records at the time of sale showing that the dealers check for straw purchases. The District Court held that ISP can issue no rules, even presumably interpretative rules, except specifically rules under 430 ILCS 68/5-30. ("[The ISP] may adopt rules regarding continuing education for certified licensees

related to … responsible business practices…" Order at 5 (A35)). Presumably, the District Court understood that such rulemaking sought in this case did not fall under that provision, though there is no such explicit statement. The holding of the District Court would then invalidate by implication all current existing regulations or interpretive rules that the ISP has issued pursuant to the Administrative Procedure Act for the enforcement of the Firearm Dealer License Certification Act. Those rules are codified at Illinois Admin. Code tit. 20, pt. 1232, which has 24 such regulations or rules as to the administration of the Act. By implication of the District Court's decision, those rules are not legally valid either. This is clear legal error. The General Assembly did not have to grant specific rule-making authority because the ISP has such authority generally.

The Illinois State Police Law, which is the organic Illinois statute creating the ISP also vests ISP with the authority to "promulgate rules and regulations *necessary* for the administration and enforcement of its powers and duties, *wherever granted and imposed*, pursuant to the Illinois Administrative Procedure Act." 20 ILCS 2605-15 (emphasis supplied). Accordingly, in enacting another law setting out duties of the ISP, the General Assembly reasonably would have assumed that the ISP already had the authority under 20 ILCS 2605-15 to issue regulations or have rules to enforce the FDLCA and not just 430 ILCS 68/5-30. Taken literally,

the District Court's holding prohibits the ISP from using any rule-making authority except under 68/5-30, which would cripple enforcement.

This is not a case, as the District Court believed, for applying the maxim "*expressio unius/exclusio alterius*," because the ISP already has general rulemaking authority for all aspects of its mission. The specific grant of rulemaking authority in 68/5-30 of the FDLCA is only an additional provision to ISP to *use* that authority in delineating the specific *practices* which the dealers need to know and to follow. There is a particular need to fill out that content, as the General Assembly did not choose to specify what "responsible business practices" were. Plaintiff, in any event, contends that just under 68/5-30 alone, the ISP could require dealers to show they understand and use the responsible business practices when the dealers seek to renew their licenses. At the very minimum, the ISP needs to know whether the ISP's instruction—assuming ISP did engage in serious instruction, and that appears not to be the case—is taking hold. A legitimate or even necessary part of an instruction program is to determine whether the dealers are using it. The relief sought here at least provides that much information. Likewise, and far more importantly, it lets the ISP know, when it traces a crime gun, what happened at the time of sale, and if only for that reason, the ISP has the authority to require records at the time of sale. This is simple information collection as to whether the dealers are engaged in responsible business practices.

## II. The ISP has discretionary authority to deny renewal of a license and may do so when the dealers fail to submit records of some kind to show they are following the practices in which the ISP is supposed to train them.

Plaintiff argues not that the FDLCA *requires* the ISP to deny a license when the dealers fail to follow responsible business practices, but only that ISP *may* do so. Given such authority to deny a license exists on that basis, the ISP *should* use that authority when it is *likely* (and Article III requires only such result be "likely") to significantly reduce the level of gun violence in the neighborhoods in which Plaintiff and so many other emotionally disabled children live. Because even the Attorney General has conceded that requiring responsible business practices is likely to result in a significant reduction of violence, the ISP has to use that authority as a reasonable accommodation to the Plaintiff under Section 504 of the Rehabilitation Act. It also has an obligation under Section 5(a)(2) of ICRA, since the disavowal of existing authority in this case is a method of administration that has a severe racial impact and is not required or even legitimate under state law. ISP has chosen a method of administration that has a severe racially disparate impact and effectively makes a dead letter of the statute.

That ISP has such authority stems from the plain language of the FDLCA, especially when read in conjunction with the Firearm Industry Responsibility Act, or FIRA. Under the FDLCA, 430 ILCS 68/5-85, the ISP *may* "refuse to renew or restore… any licensee" for "(1) Violations of this Act, *or any other law applicable to*

*the sale or transfer of firearms*," or "(2) A pattern or practice or other behavior which demonstrates incapacity or incompetency to practice under this Act." If there is a violation of FIRA or a refusal to follow responsible business practices as required by FIRA, there is necessarily a ground for the ISP to deny renewal of a license under the FDLCA. *Either* subsection of 430 ILCS 68/5-85 justifies the authority of the ISP to deny renewal of a license.

Under subparagraph (1) of this sanction, the failure by itself of a dealer to follow responsible business practices, *i.e.*, those in which the dealers are trained under 68/5-30, *also* is a per se "unlawful practice" as defined in FIRA. 815 ILCS 505/2DDDD(b). Of course FIRA is a "law applicable to the sale or transfer of firearms." 430 ILCS 68/5-85(a)(1). It can hardly be doubted that a violation of this law is a *per se* valid basis for the ISP's denial of a license. FIRA, however, is only one basis for finding that the ISP may deny a license for "violations of… *any other law.*" Of course, ISP cannot know whether it should use that authority unless it knows whether the dealer is engaged in such an "unlawful practice"—that is, unless the ISP requires the dealer to produce the dealer's records as to whether it is using reasonable business practices at the time of sale.

Likewise, under subparagraph (2), ISP has the authority to deny a license if there is a "pattern or practice" demonstrating incapacity or incompetency to act, and the crucial test of competency—perhaps the only meaningful test—is whether

the dealer is checking for straw purchases at the time of sale. Without such knowledge, ISP cannot possibly exercise such authority. And—in fact—the ISP unsurprisingly has not exercised, and almost certainly will not ever exercise, any such authority or enforce the FDLCA unless it requests the dealers to provide their records to demonstrate whether they are following the practices in which they are trained. This existence of the ISP's discretionary authority to deny a license for failure to follow reasonable business practices—authority which ISP denies that it has—seems evident under either subparagraph. Should this Court find that there is any question of the ISP's discretionary authority to deny a license for failure to follow responsible business practices, Plaintiff seeks certification of the question to the Illinois Supreme Court via a motion filed concurrently with this brief.

By engaging in a form of "don't ask, don't tell," the ISP has been tacitly author-izing—though, at least one hopes, not wink-and-nod encouraging—gun dealers to ignore the very practices in which the dealers must be trained under 68/5-30 and to do as they please. It may well be that, for political reasons, ISP just does not like the idea behind the FDLCA, or FIRA for that matter, as it has taken no action to enforce either. It is not surprising that an excellent law like FDLCA, or even FIRA, celebrated as game-changing on its passage, becomes a nullity because, out of the public view, it is not enforced. It then creates a sense of public hopelessness about the gun violence in some—and just some—city neighborhoods. It is not surprising

that this failure to use the authority—ever—has fed into a catastrophic level of violence in neighborhoods where gangs are active and supply teens and pre-teens with guns. This is a version of "don't ask/don't tell" where ISP does not "ask," does not even want to know, and cannot "tell" on the dealers, leaving the public at a loss as to why these excellent laws have no effect.

The ISP, however, has regulatory authority for the kind of relief sought here under its organic statute, *i.e.*, the Illinois State Police Law, 20 ILCS 2605-1, *et seq.* *See* Fourth Amended Class Action Complaint, ¶ 56. Indeed, Illinois has long held that "an administrative agency has authority to regulate and execute the provisions of the statute and to carry out the powers conferred upon it." *Eastman Kodak Co. v. Fair Employment Practices Comm'n,* 86 Ill. 2d 60, 70, 426 N.E. 2d 877 (1981). Such regulations are "presumed to be valid and to have the force and effect of law." *Id.* at 71. The only caveat is that an administrative agency "may not issue regulations which exceed or alter its statutory power . . . or which are contrary to the legislative purpose and intent of the statute." *Id.* at 70. As shown above, the ISP has the power to ensure that gun dealers are employing responsible business practices in the sale of guns for the legislative purpose of preventing straw purchases.

In *People v. Henry*, 398 Ill. App. 3d 1019, an appellate case challenging the ISP regarding a rule about the collection of urine samples, the court reiterated the

holding in *Eastman Kodak Co., supra,* and held that the ISP has the authority "[t]o promulgate rules and regulations necessary for the administration and enforcement of its powers and duties, whenever granted and imposed." 398 Ill. App. 3d at 1021, *citing* 20 ILCS 2605/2605-15 (West 2006). In analyzing the statute before it, the court first noted the basic rule of statutory interpretation, which states that the "primary objective of interpreting a regulation is to ascertain and give effect to the drafters' intent." *Id.* at 1024, *citing People v. Carpente*r, 385 Ill. App. 3d 156, 160, 895 N.E.2d 24, 28, 324 Ill. Dec. 24 (2008). After recognizing that "the language of the regulation itself" is "most reliable," the court stated that "intent must be ascertained from a consideration of the entire scheme, its nature, its object, and the consequences resulting from different constructions." *Id*. at 1024-25. The court concluded, holding that regulations should not be construed "in a manner that would lead to consequences that are absurd, inconvenient, or unjust." *Id. citing Carpenter*, 385 Ill. App. 3d at 161, 895 N.E.2d at 29.

Here, the "entire scheme," "nature," and "object" of the Firearm Dealer License Certification Act is to allow the ISP the authority to execute the provisions of the statute for the licensing of gun dealers. Indeed, it allows the ISP to adopt or promulgate alternative means for affidavits to validate licenses (430 ILCS 68/5-10) and alternative means for record keeping (430 ILCS 68/5-65, as amended by Section 1232.100(n) at 45 Ill. Reg. 6285, effective April 29, 2021). One of the principal

objectives of the Firearm Dealer License Certification Act is to ensure that responsible business practices are employed to halt straw purchases.

Pursuant to 20 ILCS 2605-15, the ISP has the power and authority to require gun dealers to fill out the Brady Checklist or a similar "checklist" at the time of a gun sale to enforce the ISP's duty, "granted and imposed" under the FDLCA, to require gun dealers to employ responsible business practices. Indeed, to construe the FDLCA otherwise would be absurd and unjust, as it would impose a duty without the ISP having any means to enforce it. To construe the FDLCA otherwise would be to deny the ISP the authority even to find out whether the dealers are following or have the capacity or interest in following the responsible business practices which ISP is supposed to instruct the dealers to use under 430 ILCS 68/5-30.

## III. Plaintiff has standing to sue under the Rehabilitation Act of 1973 and the Illinois Civil Rights Act of 2003.

### A. Plaintiff has pled a case or controversy pursuant to *Lujan*.

Plaintiff has pled a case or controversy under Article III pursuant to the three criteria in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The three criteria are (1) an injury in fact, *i.e.*, an invasion of a legally protected interest that is concrete, particularized, actual, and ongoing; (2) a causal connection between the injury and the conduct of the defendant; and (3) a likelihood that the injury will be

redressed or ameliorated, in part or in whole, by an order that changes the conduct of the defendant.

The District Court heretofore held that Plaintiff's FAC satisfied the element of injury in fact under *Lujan*. *See* Order at 7 (A37). The District Court premised its dismissal of the FAC on the grounds that the State Police did not have the "authority to promulgate the regulations Mathews proposes." Order at 8 (A38). As shown above, the State Police do have the authority to have gun dealers use the Brady Checklist to enforce the use of responsible business practices by gun dealers, which is the actual regulation promulgated by Plaintiff. Accordingly, Plaintiff has standing and the District Court's dismissal to the contrary should be reversed.

### B. Plaintiff has adequately alleged traceability and redressability to support standing under Section 504 and the ICRA.

The Supreme Court has held that the second element, a plaintiff's "injury has to be 'fairly traceable' to the challenged action of the defendant." *Id.* As to the third element, a plaintiff must show that, "as opposed to merely speculative," its "injury will be redressed by a favorable decision." *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). Here, the redressability occasioned by a reduction in gun violence need only be a partial reduction of such violence, as the Supreme Court has held that the "power to effectuate a partial remedy" satisfies the redressability requirement of Article III. *Church of Scientology of Cal. v. United States,* 506 U.S. 9, 13 (1992). Furthermore, although these two elements are

separate, the Supreme Court has held that they are "two facets of a single causal requirement." *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1985).

The Illinois Attorney General, Kwame Raoul, acknowledged that requiring gun dealers to engage in responsible business practices will lower the level of gun violence to which D.W. and the children in the Class are currently exposed. *See supra* note 3, Brief of State of Illinois for *Amici Curiae*. Requiring dealers to engage in responsible business practices is the remedy that Plaintiff seeks to prevent straw purchases and the flow of guns into the neighborhoods where D.W. and the class members live. The failure of the ISP to take any action to require such business practices is traceable entirely to the Defendant ISP.

Attorney General Raoul acknowledged that "empirical evidence" supports the proposition that preventing straw gun purchases will reduce the flow of guns into Chicago neighborhoods, which, *a fortiori*, would reduce violence from such guns. *Id.* at 7. Indeed, the Attorney General stated that "gun dealers contribute to the harm caused by firearms entering the illegal market when they engage in unlawful or irresponsible business practices, such as by selling firearms to known straw purchasers (that is, someone purchasing on behalf of another person) or to individuals who do not provide appropriate documentation." *Id.* at 8-9. (citing Phillip Cook, *et al., Some Sources of Crime Guns in Chicago; Dirty Dealers, Straw Purchasers, and Traffickers*, 104 J. of Crim. L. & Criminology 717, 715 (2015); Rachana Bhowmik,

*Aiming for Accountability: How City Lawsuits Can Help Reform an Irresponsible Gun Industry,* 11 J.L. & Pol'y 67, 108-09 (2002)).

Therefore, the Attorney General added, "studies show that when gun dealers either are held accountable for their sales to straw purchasers or choose to engage in more responsible business practices that prevent such sales, there is a significant decrease in the flow of firearms into the illegal market." *Id.* at 10 (citing Daniel W. Webster, *et al., Effects of Undercover Police Stings of Gun Dealers on the Supply of New Guns to Criminals,* 12 Inj. Prevention 225, 225-30 (2006); Daniel W. Webster, *et al., Effects of a Gun Dealer's Change in Sales Practices on the Supply of Guns to Criminals,* 83 J. of Urban Health 778, 778-87 (2006)).

The statements of the Attorney General support the elements of traceability and redressability alleged by the Plaintiff. The District Court also understood Plaintiff's argument:

> The fourth amended complaint traces this injury to defendants as follows: (1) crime guns flow into Chicago and are sometimes used in D.W.'s and class members' neighborhoods; (2) some crime guns are obtained in straw purchases; (3) a disproportionate number of the straw purchases occur at seven firearm dealers in Chicago's suburbs; and (4) defendants fail to regulate those seven dealers in a manner that would decrease the rate of straw purchases. *See* Fourth Am. Compl. ¶¶ 68-97.

Order at 8 (A38). The sole reason the District Court did not hold the allegations sufficient to support standing was based on the premise that the State Police did not have the "authority to promulgate" the relief sought. *Id.*

As Plaintiff has shown above, the ISP does have the authority under Illinois state law to regulate gun dealers, and specifically to enforce the responsible business practices to prevent straw sales. As the injury in fact is a rule of the case, and as the empirical evidence demonstrates and the Attorney General acknowledges the effect of preventing straw purchases on reducing gun violence, Plaintiff has sufficiently alleged standing to sue in this Action. Accordingly, this Court should reverse the dismissal of the action and remand the action back to the District Court.

## CONCLUSION

Under Illinois State Law, the Defendant-Appellee State Police have the authority to promulgate the relief sought by Plaintiff-Appellant. Accordingly, for the reasons set forth herein, Plaintiff-Appellant respectfully requests this Court reverse the judgment of the District Court dismissing the action on lack of standing, and remand for further proceedings consistent with such guidance as this Court deems appropriate. In the alternative, Plaintiff-Appellant moves that this Court certify a question of law to the Illinois Supreme Court, namely, whether ISP has the authority to deny renewal of licenses for failure of dealers to follow responsible business

practices in which the ISP is obligated under 430 ILCS 68/5-30 of the FLDCA to train them.

Dated: October 6, 2025

Respectfully submitted,

/s/ Thomas H. Geoghegan
Attorney for Plaintiff-Appellant

DESPRES, SCHWARTZ, & GEOGHEGAN, LTD.
Thomas H. Geoghegan
Will W. Bloom
77 West Washington Street
Suite 711
Chicago, Illinois 60602
(312) 372-2511
tgeoghegan@dsgchicago.com

POMERANTZ, L.L.P.
Patrick V. Dahlstrom
10 South La Salle Street
Suite 3505
Chicago, Illinois 60603
(312) 377-1181
pdahlstrom@pomlaw.com

*Attorneys for Plaintiff-Appellant and the Class*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE LIMITATIONS**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 6,931 number of words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 13-point Book Antiqua type.

Dated: October 6, 2025

*/s/ Thomas H. Geoghegan*
Attorney for Plaintiff-Appellant

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(a) and (b)**

This brief complies with the requirements of Circuit Rule 30(a) and (b) in that it is being filed simultaneously with a "short appendix" containing the judgement or order under review and any other required materials.

Dated: October 6, 2025

*/s/ Thomas H. Geoghegan*
Attorney for Plaintiff-Appellant

Nos. 25-2182, 25-2312

———————————————————

**UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

———————————————————

**SHANIECE MATHEWS, as guardian** *ad litem* **and on behalf
of her son, D. W.,**

Plaintiff-Appellant/Cross-Appellee,

v.

**STATE OF ILLINOIS,** *et al.***,**

Defendants-Appellees/Cross-Appellants.

———————————————————

Appeal from the United States District Court
for the Northern District of Illinois,
Case No. 1:18-cv-06675
The Honorable Joan B. Gottschal

———————————————————

**SHORT APPENDIX OF
PLAINTIFF-APPELLANT/CROSS-APPELLEE**

———————————————————

DESPRES, SCHWARTZ, & GEOGHEGAN, LTD.
Thomas H. Geoghegan
Will W. Bloom
77 West Washington Street
Suite 711
Chicago, Illinois 60602
(312) 372-2511
tgeoghegan@dsgchicago.com

POMERANTZ, L.L.P.
Patrick V. Dahlstrom
10 South La Salle Street
Suite 3505
Chicago, Illinois 60603
(312) 377-1181
pdahlstrom@pomlaw.com

*Attorneys for Plaintiff-Appellant and the Class*

i

## SHORT APPENDIX TABLE OF CONTENTS

SHORT APPENDIX TABLE OF CONTENTS ............................................................... ii

FOURTH AMENDED COMPLAINT ......................................................................... A1

DISTRICT COURT OPINION AND ORDER ........................................................... A31

DISTRICT COURT JUDGMENT ............................................................................. A40

NOTICE OF APPEAL ............................................................................................... A41

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| SHANICE MATHEWS as guardian *ad litem* on behalf of her son, D.W. as well as on behalf of a class of similarly situated children, | ) ) ) ) | |
| | ) | No. 18-cv-6675 |
| Plaintiff, | ) ) | |
| | ) | Judge Joan B. Gottschall |
| v. | ) ) | |
| THE STATE OF ILLINOIS; THE ILLINOIS DEPARTMENT OF STATE POLICE; J.B. PRITZKER, Governor of the State of Illinois; and BRENDAN KELLY, Director of the Illinois Department of State Police, | ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**<u>FOURTH AMENDED CLASS ACTION COMPLAINT</u>**

## INTRODUCTION

1.  Every day, Black children in the highest crime Chicago neighborhoods endure the worst of the nation's illegal gun violence.

2.  The number of children like Plaintiff D.W. who are repeatedly traumatized from daily exposure to illegal gun violence is far greater than the number of children who are directly wounded or murdered, though that number of physical casualties is horrific enough. For example, in the first five months of 2021, more than 120 children under the age of 18 were shot in Chicago. In addition to that number, hundreds more suffer trauma or renewed trauma as family members, friends, classmates, and neighbors are gunned down or hit with a stray bullet, sometimes right in front of them.

3.  Defendants—the State of Illinois and the Illinois State Police, and the individual Defendants—have the legal authority and duty to take actions that are likely to reduce the number of illegal crime guns in circulation in these high crime Chicago neighborhoods. As Plaintiff will show in this Fourth Amended Complaint, respected academic research and empirical evidence demonstrates that if Defendants require Illinois firearm dealers to follow responsible business practices designed to prevent straw sales and illegal racketeering, it is likely to reduce the number of illegal crime guns circulating in the high crime neighborhoods where Plaintiff D.W. and other children live. That, in turn, is likely to reduce the level of gun violence to which these children are exposed daily and that acts to cause trauma or to re-enforce or aggravate further the debilitating trauma from which these children already suffer.

4.  Specifically, this lawsuit seeks to require the Defendant Illinois State Police ("ISP"), in concert with the Defendant States and the individual Defendants, to condition renewal of licenses of Illinois firearm dealers on their documented compliance with responsible business practices designed to prevent sales to persons when there are indications of straw purchasing. As set forth

A2

below, Defendant ISP has such authority under the Firearm Dealer License Certification Act, 430 ILCS 68/1, *et seq.*

5.     Like all illegal guns, the guns trafficked into Chicago originate from the legal firearms market. The federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has reported for decades that the legal inventories of retail firearms dealers are a dominant source of weapons for illegal traffickers, who acquire firearms through theft or straw purchases.

6.     Accordingly, the retail sale of firearms is the first line of defense in preventing the diversion of legal guns to the illegal market, and the business practices of licensed dealers play a critical role in trafficking prevention.

7.     Licensed gun dealers operating in Illinois were responsible for selling forty (40) percent of Chicago's "crime guns"—or guns recovered by law enforcement in connection with crime. The majority of these guns stem from licensed dealers operating in suburbs near Chicago, with only seven dealers responsible for selling the majority of Chicago's crime guns attributed to Illinois dealers.

8.     The failure of Defendant ISP, in concert with the other Defendants, to take action that is likely to reduce the level of illegal gun violence from straw purchasing and illegal trafficking is an unlawful denial of a reasonable accommodation to the needs of Plaintiff D.W. and other traumatized children. This failure to accommodate Plaintiff D.W. and these children denies them the benefits of federally assisted law enforcement and is a prohibited form of discrimination under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C § 794.

9.     That same failure to accommodate the needs of Plaintiff D.W. and other such children is also illegal under Section 5(a)(2) of the Illinois Civil Rights Act of 2003 ("ICRA"), 740 ILCS 23/5(a)(2). In violation of that Act, the Defendants State of Illinois and ISP are using "criteria or

methods of administration" that serve no valid public purpose and, in effect, subject Black children like Plaintiff D.W. to discrimination based on race.

10.  As shown during the COVID-19 pandemic, the State and Governor take an extremely broad view of their regulatory authority when the public health of the white population is also at risk. Here, by contrast, in the case of Black children, and in a genuine public health emergency, the Defendants fail to use broad regulatory authority that would be used if the children were white. Defendants have failed to use regulatory authority to protect Black children's emotional and physical health, instead deferring to a disproportionately white population of gun dealers by favoring their apparent interests above all else.

11.  In deferring to such interests and failing to use their full regulatory authority to protect Black children under the Firearm Dealer Licensing Certification Act, 430 ILCS 68/1, *et seq.* the defendants subject Black children to discrimination based on race, in violation of Section 5(a)(2) of ICRA.

## THE PARTIES

### The Plaintiff

12.  Shanice Mathews is a forty-eight-year-old resident of the Garfield Park neighborhood in Chicago. She has spent more than twenty years as a case manager for Senior Helpers, an organization primarily involved with in-home care for chronically ill seniors. She has four children, including the plaintiff D.W, who is now 14 years old. D.W.'s cousin was shot and killed in the North Lawndale neighborhood of Chicago on October 8, 2018. D.W., then in the fourth grade, was just blocks away from the shooting at the time. Just a month and a half after the murder of D.W.'s cousin, another one of D.W.'s cousins shot and killed himself with a handgun. In the five years D.W. has lived in West Garfield Park following the murder of his cousin, there have been more than ten shootings within a four-block radius of his home. Hearing gunshots is a weekly

and sometimes daily occurrence in D.W.'s life. D.W. is an "individual with a disability" within the meaning of 29 U.S.C. § 705 (20)(B), which includes any individual who has a disability within the meaning of 42 U.S.C. § 12102. Shanice Mathews brings this case on behalf of her son D.W. as guardian *ad litem* under Fed. R. Civ. P. 17(c).

13.   Pursuant to Fed. R. Civ. Proc. 23(b)(2), Plaintiff Mathews also brings this action for declaratory and injunctive relief both on behalf of her minor child and on behalf of a class of similarly situated children. The class is defined as individuals under age 18 who suffer mental disability within the meaning of 42 U.S.C. §12102 from exposure to high levels of illegal gun violence resulting from straw purchases and illegal trafficking of guns and who currently live in one of the 15 highest gun crime community areas as determined by the City of Chicago. The proposed class for declaratory and injunctive relief meets the four prerequisites for class certification under Rule 23 of the Federal Rules of Civil Procedure.

## The Defendants

14.   The defendant State of Illinois is a "State" operating programs receiving federal assistance within the meaning of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794(b)(1)(A) and (B). It is also a "State" within the meaning of Section 5 of the Illinois Civil Rights Act of 2003, 740 ILCS § 23/5.

15.   The defendant Illinois Department of State Police ("ISP") is also a "department, agency or… other instrumentality of a State" receiving federal assistance and all of whose operations constitute a "program or activity" within the meaning of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794(b)(1)(A) and (B). The ISP is also a unit of the State within the meaning of Section 5 of the Illinois Civil Rights Act of 2003, 740 ILCS § 23/5.

16.   The Defendant J.B. Pritzker is the Governor of the State of Illinois and responsible for the policies implemented by the defendant State of Illinois.

17. The Defendant Brendan Kelly is the Director of the Illinois Department of State Police and, under the direction of Defendant Pritzker, is responsible for the policies implemented by the State Police.

## JURISDICTION AND VENUE

18. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 and because of its supplemental jurisdiction under 28 U.S.C. § 1367 over the related state law claim.

19. Venue is proper in the Northern District of Illinois, as the Plaintiff and Defendants are either residents or conduct activities in Northern District of Illinois, and the events and omissions giving rise to the harm alleged by Plaintiff occurred in the Northern District of Illinois.

## FACTUAL ALLEGATIONS

### The Public Health Emergency in Chicago

20. Plaintiff Mathews' son D.W. and other Black children in the proposed class have experienced unremitting gun violence in the neighborhoods where they live or lived. The Chicago Police Department and University of Chicago Crime Lab studies document that from January 1, 2015, through June 30, 2018, more than 2,000 people in Chicago were murdered. Ninety percent of these murders were by gun. Chicago has more gun-related homicides than any other major U.S. city. From January 1, 2015, through July 31, 2018, nearly 8,000 people were shot in Chicago—about one shooting victim every 2.5 hours. Nearly 20 percent of Chicago's homicide victims are teenagers or younger. Law enforcement reported that during the first five months of 2021, 108 children were shot and 16 killed by guns in Chicago.

21. This gun violence is a public health emergency that afflicts various Black neighborhoods in Chicago, particularly: Austin, Englewood, West Englewood, New City, and Grand Crossing ("the communities of concentrated gun violence"). In 2015-2016, according to the University of Chicago Crime Lab, 80 percent of Chicago homicide victims were Black, though Black people

comprise only about one-third of the city's population. Eighty percent (80%) of homicide victims continue to be Black when one looks only at killings during the first seven months of 2018. Black men aged 15 to 34 made up more than one-half of the city's homicide victims during this same period while accounting for just four percent (4%) of the city's population. Despite having only nine percent (9%) of Chicago's population, the Black neighborhoods of Austin, Englewood, West Englewood, New City, and Grand Crossing accounted for almost one-third of homicides in 2016, and this pattern has continued. The national homicide rate is about 5 per 100,000 persons across the whole country. In the Austin neighborhood of Chicago, in 2016, the homicide rate was 87.3 per 100,000 persons, according to the University of Chicago Crime Lab. In Englewood, the homicide rate was 179.5 per 100,000 persons; in West Englewood, it was 105 per 100,000 persons; in New City, it was 98.6 per 100,000 persons and in Grand Crossing, it was 103.5 per 100,000. These five neighborhoods have the most deaths by gun violence of any neighborhoods in Chicago. They are Black neighborhoods. Five of the next six deadliest neighborhoods are also predominantly Black.

22. By comparison, the white Chicago neighborhoods of Lincoln Park, North Center, Edison Park, Forest Glen, North Park, Hegewisch, Beverly and Mount Greenwood had no homicides in 2015 or 2016, and the white neighborhoods of Lake View, Lincoln Square, Jefferson Park, Calumet Heights, Edgewater, Montclare, O'Hare, Dunning, and Norwood Park had two or fewer murders during this two-year period, meaning a zero or negligible homicide rate. This disparate impact of gun violence has continued through to the present day.

23. Fatalities are only one aspect of a broader public health emergency that the plaintiff and other members of the class are experiencing. The Plaintiff and other class members are suffering from traumatic exposure to this violence in a way that has created serious disabilities and limits on

their life activities. The Plaintiff and other Black children hear gunfire most nights while in their homes and walking the streets, and these numerous firings can recreate prior traumatic exposures to gun violence, from the loss of a family member, parent, sister, brother, cousin, or schoolmate.

24.   Chicago police are currently recovering over 10,000 crime guns a year. Yet, many of these crime guns were purchased in the first instance from a federally licensed gun dealer that Illinois law requires the Defendant ISP to certify to legally operate within Illinois. Some of these dealers violate the law or fail to implement reasonable business practices that prevent gun traffickers from acquiring firearms through unlawful transfers, including theft or straw sales.

25.   An increasing number of these guns are 9-millimeter or .40 caliber handguns that have larger capacity magazines for ammunition and are more powerful than the .22 caliber handguns that were the principal handguns in the past.

**A Substantial Number of the "Crime Guns" Used in Chicago
Come from Chicago Area Gun Dealers**

26.   Chicago has no licensed gun dealers, but according to the Chicago Police Department, 40.4 percent of the "crime guns" recovered on Chicago streets every year from 2009 through 2016 were purchased from federally licensed gun dealers operating in Illinois. This figure has not changed materially in the 2017 Gun Trace Report issued by the City. There has been no further or updated Gun Trace Report by the City since 2017, though on information and belief, the City, in partnership with the University of Chicago Crime Lab, is preparing a follow-up study that will be available in 2024. Seven of the stores selling the most crime guns recovered in Chicago shootings, as set out in these Reports, are located in Illinois (with the remainder located nearby in Indiana). These Illinois gun dealers are:

> Chuck's Gun Shop in Riverdale, IL
>
> Midwest Sporting Goods in Lyons, IL

Shore Galleries in Lincolnwood, IL

GAT Guns in East Dundee, IL

Suburban Sporting Goods in Melrose Park, IL

Pelcher's Shooter Supply in Lansing, IL

Sporting Arms & Supply in Posen, IL

27.   Large numbers of guns purchased from these dealers were recovered in connection with crimes within one year of their purchase. ATF and other law enforcement entities recognize a short "time-to-crime" as an indicator of illegal trafficking.

28.   Suburban Sporting Goods in Melrose Park, IL, sold 85 guns recovered as "crime guns" in Chicago in 2016 alone, and 46 percent of these guns were sold less than a year before their recovery. Sixty-eight percent (68%) of the "crime guns" sold were recovered within three years of retail sale. Chuck's Gun Shop in Riverdale, IL, sold 997 "crime guns" during the period 2013-2016, 21 percent (21%) of which were recovered within one year of retail sale. Ninety-two percent (92%) of the "crime guns" sold by these stores are handguns.

29.   During the 2013-2016 period, federally licensed gun dealers in Illinois reported that 1,200 guns were lost or stolen from these dealers prior to any sale. This includes burglaries, robberies, and off-the-books sales. Thefts and burglaries, in particular, are increasing at an alarming rate. Burglaries at these stores tripled between 2015 and 2016. ATF has found that these stolen guns are almost assuredly destined for criminal use in the immediate area of the theft. Chuck's Gun Shop alone reported 43 guns stolen between 2013 and 2016.

**The State of Illinois Has Failed to Implement Meaningful Gun Trafficking Prevention Regulation in Illinois, Despite Ample Authority to Do So**

30.   The single most effective way to reduce the flow of illegal "crime guns" circulating in the neighborhoods where children like Plaintiff D.W. live is for the Defendants to require licensed Illinois dealers to follow and use responsible business practices with each sale and refuse to sell

guns to persons when indicators of a straw purchase are present. This does not require the Defendants to fine, penalize, or take any criminal prosecution of any such dealers but only to condition the renewal of the dealers' licenses on documentation that the dealers are following the practices in which they are supposed to be trained with respect to each sale.

31. Defendant ISP has multiple statutory sources for the exercise of such authority. First, it is illegal in Illinois under federal and state law for either the gun dealer or the transferee to engage in a straw sale if either party *knew or should have known* the transfer was a straw sale. See 18 U.S.C. § 922(a)(6); 27 CFR § 478.128; 430 ILCS 68/5-85(a).

32. Second, the organic statute creating the Defendant ISP vests ISP with the authority to "promulgate rules and regulations *necessary* for the administration and enforcement of its powers and duties, *wherever granted and imposed*, pursuant to the Illinois Administrative Procedure Act." 20 ILCS 2605-15 (emphasis supplied).

33. Additionally, under the Firearm Dealer Licensing Certification Act 430 ILCSD 68/5-60 , the Defendant ISP has both the power and duty to require responsible business practices, which include a requirement that dealers not sell to persons when there are indicators of a straw purchase in connection with a specific sale.

34. In 2018, the General Assembly adopted the Firearm Dealer Licensing Certification Act, 430 ILCS 68/5-60, for the purpose of stopping illegal gun trafficking by requiring dealers to adopt practices that would reduce the diversion of legal firearms to the illegal market through theft, loss, or straw sales. In addition to robust security and inventory management requirements, section 430 ILCS 68/5-60 of the Dealer Licensing Act states: "[t]he Illinois State Police shall develop and implement by rule statewide training standards for assisting certified licensees in recognizing indicators *that would lead a reasonable dealer to refuse sale of a firearm, including, but not limited*

9

*to, indicators of a straw purchase.*" (emphasis supplied). Under 430 ILCS 68/5-30 of the same Act, the Defendant ISP also has broad regulatory authority to require training in responsible business practices to be determined by the Defendant ISP.

35. Necessarily, the Defendant ISP has the authority to require dealers to follow those responsible business practices and to fine or suspend or deny certification of their licenses if the dealers fail to do so. Under 430 ILCS 68/5-85 of the Firearm Dealer Licensing Certification Act, the Defendant ISP has the power to "refuse to renew… any licensee… for each violation for… (2) a pattern of practice… which demonstrates… incapacity or incompetency to practice under the Act." Such a pattern or practice of incapacity or incompetency is acknowledged by Defendant ISP to include incapacity to stop straw purchases and illegal gun trafficking through these dealers.

36. Since Defendant ISP is authorized by law to require dealers not to engage in straw sales and illegal trafficking and follow business practices, and even to discipline dealers who show incapacity or incompetence to practice under 430 ILCS 68/5-85, Defendant ISP necessarily has the regulatory authority by administrative rule to condition renewal of dealer licenses on documentation that the dealers are following responsible business practices, and refusing to engage in sales when indicators of a straw purchasing and illegal trafficking are present.

37. The federal ATF and the National Shooting Sports Foundation (NSSF), the gun industry's trade association, have developed resources that instruct gun dealers to engage potential purchasers in conversation to ferret out indicators that the customer is a straw purchaser through the "Don't Lie for the Other Guy" campaign.

38. Requiring dealers to follow the practices or protocols as a condition for certification of a dealer license under 430 ILCS 68/5-85 would substantially reduce straw purchases and

10

A11

dramatically reduce the gun violence to which the Plaintiff and other class members are now exposed.

39. For example, as part of the responsible business practices to be followed, the Defendant ISP can require dealers to refuse sales when customers are (1) buying multiples of the same handgun in the same transaction or within a short period of time or (2) seeking the purchase of a handgun when a gun previously bought by the same purchaser was recovered at a crime scene and not reported lost or stolen.

40. Likewise, as a responsible business practice, dealers should be trained to require valid Firearm Owner Identification Cards ("FOID") cards from persons purchasing ammunition, as failure to do so is effectively facilitating gun use by persons without valid FOID cards.

41. Defendant ISP has also failed to perform its responsibility under the Illinois Gun Trafficking Information Act, 5 ILCS 830/10-5, to produce reports to determine patterns of straw purchasing by specific dealers and to develop a state-wide firearms trace system to do so.

42. Defendant ISP has also failed to provide transparency or disclose its own actions in enforcing state gun laws, including the FOID Act and the Firearm Dealer Licensing Certification Act, in violation of the Gun Trafficking Information Act, 5 ILCS 830/10-5.

43. Defendant ISP can and should disclose properly redacted summaries of its inspections of dealers and other enforcement activities and "use all reasonable efforts… in making publicly available, on a regular and going basis, key information related to firearms used in the commission of crimes in this State," including the identity of the "Federal Firearms Licensee that sold the firearm…." 5 ILCS 830/10-5(a).

A12

44. Defendant ISP is also supposed to "study, on a regular and ongoing basis, and compile reports… to determine firearms trafficking and straw purchase patterns," but has produced no such reports even at this late date. 5 ILCS 830/10-5(b).

45. By refusing to make use of Defendant ISP's authority to hold dealers accountable for straw purchasing and trafficking, Defendants permit new illegal guns to circulate in the high crime neighborhoods even as the Chicago Police Department ("CPD") collects thousands of guns previously bought from many of these problem dealers.

**The Pervasive Gun Violence in Chicago's Black Neighborhoods Has Caused Thousands of Black Children to Become Disabled Under the ADA**

46. The continuing gun violence in Chicago has left thousands of the city's Black residents, including children in the plaintiff class, dead or with physical and emotional wounds. As Dr. Shani Buggs from the University of California at Davis Gun Violence Research Center notes, gun trafficking and pervasive gun violence's repercussions stretch well beyond those directly hit with a bullet, reverberating within entire communities for decades through depressed home prices, reduction in the growth of new retail and services, lack of economic or career opportunities in the immediate vicinity, and lack of access to healthcare, healthy food, or social opportunities.

47. Pervasive gun violence and the constant trauma and fear that it produces has had an acute and dramatic effect on the social and emotional health and educational opportunities of the children exposed to such violence who have not been shot, like the plaintiff and other class members in this case. A Chicago mother interviewed by a local author, Alex Kotlowitz, in his book "An American Summer" captured it best: "It's like Russian roulette every time they walk out the door."

48. The number of children who are traumatized by living under that daily fear when deciding whether to play with friends, get fresh air, or go to school are far larger in number than those who have been killed and maimed.

49. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, protects an "individual with a disability" under 29 U.S.C. § 705(20)(B), which adopts the definition of a "disability" under 42 U.S.C. § 12102 of the Americans with Disabilities Act ("ADA") as "a physical or mental impairment that substantially limits one or more major life activities of such individual", 42 U.S.C. §12102(1)(A). Major life activities under this section "include, but are not limited to, ***caring for oneself***, performing manual tasks, seeing, hearing, eating, ***sleeping***, walking, standing, lifting, bending, speaking, breathing, ***learning, reading, concentrating, thinking, communicating,*** and working" (emphasis supplied).

50. It is well-established among physicians, trauma specialists, and educators, as well as in the scientific, peer-reviewed literature, that when a child, particularly a young child, is exposed to gun violence, there is a dramatic and lasting impairment of the child's basic life activities. This includes deficits in the child's ability to care for himself or herself, the child's sleep, reading abilities, learning capacity, concentration, thinking, and communication. As a result of these deficits, gun violence directly undermines the child's academic performance and his or her educational opportunities.

51. Many studies have found that children directly or indirectly exposed to community violence, most often gun violence, develop acute or post-traumatic stress disorder, including disrupted sleep, anxiety, and fear, as well as reduced awareness and difficulty with concentration, thinking, and memory, all of which impair cognitive functioning. Exposure to gun violence floods a child's body with stress hormones (adrenaline and cortisol) that independently undermine cognitive performance by compromising the function of the prefrontal cortex of the brain (the area of the brain that is most rapidly developing in adolescence). This portion of the brain is responsible for reflective self-regulation and sustained attention, thus inhibiting the child's memory, ability to

A14

sustain concentration and brain development. The child's analytical capacities (or executive function) tend to disintegrate, leaving the child disorganized cognitively and emotionally, and thus prone to react in school with extreme helplessness, confusion, withdrawal, or rage. The more directly the child experiences gun violence and the more often it happens, the more enduring and permanent are his or her deficits. This literature is summarized in many places, including by the Violence Policy Center, "The Relationship Between Community Violence and Trauma: How Violence Affects Learning, Health and Behavior," (July 2017), www.vpc.org; by Sharkey, "The Long Reach of Violence: A Broader Perspective on Data, Theory, and Evidence on the Prevalence and Consequences of Exposure to Violence," Annual Review of Criminology, Vol. l:85-102 (January 2018); and by Cook, *et al.*, "Complex Trauma in Children and Adolescents," Psychiatric Annals, Vol. 35(5): 390-398 (2005).

52. For over twenty years, research has shown that exposure to gun violence negatively affects a range of developmental outcomes across social-emotional, behavioral, and cognitive domains. *See, e.g.*, Bingenheimer, et al., "Firearm Violence Exposure and Serious Violent Behavior," Science, Vol. 308:1323-26 (2005); and Osofsky, "The Impact of Violence on Children," Future of Children, Vol. 9:33-49 (1999). It has also consistently shown that exposure to gun violence and other forms of violence is associated with lower performance on assessments of reading, cognitive skills, grade point average, and school attendance. *See, e.g.*, Bowen, *et al*., "Effects of Crime and Violence in Neighborhoods and Schools on the Social Behavior and Performance of Adolescents," Journal of Adolescent Research, Vol. 14: 319-42 (1999) and Delaney-Black, *et al.*, "Violence Exposure, Trauma, and IQ and/or Reading Deficits among Urban Children," Archives of Pediatrics and Adolescent Medicine, Vol. 156: 280-85 (2002).

53. In Chicago, there have been many studies linking exposure to gun violence directly to deficits in academic performance by Black children. In 2010, Dr. Patrick Sharkey used Chicago homicide data and cognitive assessment data on hundreds of children aged 5 to 17 from the Project on Human Development in Chicago Neighborhoods to assess the effect of a single homicide incident located near a student's home on that student's vocabulary and reading skills, using sub-tests of the Wechsler Intelligence Scale for Children and the Wide Range Achievement Test. For Black children, a homicide located on their block within one week of cognitive assessment testing showed (on average) a reduction in performance of 0.5 standard deviations relative to other Black children living in the same neighborhood who had not been exposed to a homicide. The children lost .65 standard deviations in their reading scores when tested within four days of a homicide occurring on their block (whether the child saw the homicide or not). A separate study of Chicago data referenced by Dr. Sharkey, and used for comparison, found that a homicide within a child's census tract occurring within four days of cognitive assessment found a loss of a full 1.0 in standard deviation on a letter-word test, as compared with other children from the same neighborhood. Sharkey, "The Acute Effect of Local Homicides on Children's Cognitive Performance," Proceedings of the National Academy of Sciences, Vol. 107(26): l 1733-38 (2010). Dr. Sharkey has demonstrated the same causal effect between exposure to gun violence and deficits in standardized test scores administered in the schools of New York City (using time and location), *see* Sharkey, *et al*., "High Stakes in the Classroom, High Stakes on the Street: The Effects of Community Violence on Students' Standardized Test Performance," Sociological Science, Vol. l (3): 199-220 (2014); *see also*, Lacoe, *et al.*, "Too Scared to Learn? The Academic Consequences of Feeling Unsafe in the Classroom," Urban Education, https://doi.org/10.I 177/0042085916674059 (October 2016), (tracking 340,000 New York City public school students

over successive academic years to find that in years when students reported feeling unsafe, their standardized test scores declined significantly).

54. Dr. Dana Charles McCoy and colleagues studied 602 Chicago children from high-crime Chicago neighborhoods in 2004 and 2005 and then followed up with them in 2010 and 2011 to study the relationship between their exposure to violent crime (taking place within a half mile of their home (which they may or may not have witnessed) and within seven days of testing) and their performance on a neuropsychological assessment which measured their cognitive performance and selective attention. These researchers found a direct relationship between exposure to violence and a deficit in neuropsychological functioning as a result of the children's exposure to gun violence. McCoy, *et al*., "Children's Cognitive Performance and Selective Attention Following Recent Community Violence," Journal of Health and Social Behavior, Vol. 56(l): 19-36 (2015).

55. Gun violence affects everyone in school, even those not exposed. This was demonstrated by Dr. Julia Burdick-Will, who took five cohorts of Chicago Public School students (from 2002 to 2010) and examined the relationship between performance on standardized tests and the level of violence experienced in the school (as determined by Chicago police locational crime data and survey tools). Many students did not experience gun violence, but the whole school felt less safe. One standard deviation increase in classmates' exposure to neighborhood violence was related to a 0.3 standard deviation decline in both reading and math scores—which represents ten percent (10%) of normal student annual growth. Burdick-Will, "Neighborhood Violence, Peer Effects, and Academic Achievement in Chicago," Sociology of Education, Vol. 91(3): 205-223 (2018).

**Plaintiff's Exposure to Gun Violence Has Left Him Disabled Within the Meaning of Section 504 of the Rehabilitation Act**

56. D.W. is now 14 years old. He lives with his mother, his sister Ashley, and Ashley's two children. D.W.'s mother works for Senior Helpers as a case manager in charge of coordinating in-home care for chronically ill seniors.

57. On the night of October 8, 2018, D.W. and his mother were spending quality time with their family in the neighborhood where D.W. was raised, North Lawndale. That same night, Marquise Willingham, D.W.'s cousin, was returning home from a high school football game at Collins Academy High School. Just blocks away from where D.W. and his family were having a quiet night with their relatives, a car pulled up next to Marquise on his walk home from the game. A gunman got out of the car and shot Marquise twice in the shoulder and once in the head. Ms. Mathews heard a banging on the door and answered. It was a family friend in tears screaming that Marquise had been murdered.

58. D.W., just nine years old at the time, heard the news from the other room of the house. D.W. was shielded from seeing his cousin's bleeding body by his mother. He would later accompany his family to the coroner's office to identify the body. D.W., overcome with grief, decided to stay in the car. The police have labeled Marquise's death a homicide. The case remains unsolved.

59. The loss of D.W.'s cousin at the hands of gun violence forever altered D.W.'s life. With little money and no counseling resources available to the family, D.W. was left with very little to deal with so much trauma.

60. After the killing of his cousin, D.W. began having severe emotional swings manifesting in massive angry outbursts seemingly triggered by small discomforts. These outbursts disrupted class, caused D.W. to shake uncontrollably, and lasted long periods of time.

A18

61. D.W.'s learning has also suffered. For the first time in his school career, he started manifesting symptoms of attention deficit hyperactivity disorder, often requiring fidget spinners and other gadgets to keep him in his seat. Much more than was the case prior to the murder, D.W. now experiences difficulties in focusing, reading, communicating, and listening.

62. D.W.'s exposure to gun violence has caused D.W. to seem more stressed. He is acutely aware of the dangers guns pose to him and his family. D.W. has ongoing fear for his own life and the lives of his family members.

63. On November 23, 2018, just a month and a half after his cousin's murder, another one of D.W.'s cousins died by suicide by shooting himself in the head. D.W. was with his family mourning the recent death of another cousin from cancer. As the family huddled together in D.W.'s living room after returning from the hospital, D.W.'s aunt received the heart wrenching phone call concerning her son's suicide. D.W., like the rest of his family, broke down in tears as the news was shared throughout the house. Neither D.W. nor Ms. Mathews knows why Keyonte killed himself.

64. Not only has gun violence touched D.W.'s family directly, but it remains a consistent part of his life. On more than a handful of occasions, D.W. and his classmates have been held back during dismissal because gunshots were heard on an adjacent block. In the five years since D.W. has lived in Garfield Park, at least ten shootings have occurred within a four-block radius of D.W.'s home. D.W. and his mother regularly hear gunshots at night while going to sleep. Since the murder of his cousin, D.W. has had trouble sleeping, often reporting dreams about his cousin to his mother.

65. D.W. is an individual with a disability under 29 U.S.C.§ 705 (20)(B) of Section 504 of the Rehabilitation Act because D.W. has a disability within the meaning of 42 USC 12102 of the Americans with Disabilities Act. He suffers from a trauma-induced mental impairment that

A19

substantially limits his abilities to sleep, learn, read, concentrate, think, communicate, and participate fully in school.

66.   D.W. continues to live in the Garfield Park neighborhood of Chicago, where gun violence is just a normal part of life.

67.   D.W.'s past and continued exposure to gun violence has impaired his basic life activities and threatens to make his condition more severe.

**CLAIMS**

**COUNT I – VIOLATION OF SECTION 504 OF THE REHABILITATION ACT: FAILURE TO REQUIRE DEALERS TO FOLLOW RESPONSIBLE BUSINESS PRACTICES**

68.   Under the Firearm Dealer Licensing Act 430 ILCS 68/5-60 defendant ISP is directed to train dealers in "responsible business practices."

69.   The Act states: "[t]he Illinois State Police shall develop and implement by rule statewide training standards for assisting certified licensees in recognizing indicators *that would lead a reasonable dealer to refuse sale of a firearm, including, but not limited to, indicators of a straw purchase*" (emphasis supplied).

70.   Defendant ISP has not complied with this provision because Defendant ISP does nothing more than request the dealers to review the PowerPoint slideshow attached as Exhibit A and submit a declaration that they viewed the video found on the ISP's website at https://isp.illinois.gov/foid/fdlc/training/trainingVideo. Defendant ISP makes no effort to require dealers to use responsible business practices identified by these materials to refuse sales of a firearm when there are indications of the straw purchase at 430 ILCS 68/5-60 intends.

71. Defendant ISP has full authority to require dealers to follow these responsible business practices, as set forth in the training materials and publicized in the national campaign known as "Don't Lie for the Other Guy," sponsored by ATF and NSSF.

72. Under Section 10 of the Firearm Dealer Licensing Certification Act, 430 ILCS 68/5-85, the Defendant ISP has the power to "refuse to renew… any licensee… for each violation for… (2) a pattern of practice… which demonstrates… incapacity or incompetency to practice under the Act," and can condition renewal of a license on documentation that dealers are following responsible business practices with respect to each gun sale. Defendant ISP fails to use that authority.

73. Requiring such practices is one of the essential means to stop the spread of guns through straw sales. The Illinois Attorney General, Kwame Raoul, writing on behalf of seventeen other state attorney generals, filed an amicus brief in *National Shooting Sports Foundation, Inc. v. Letitia James*, 22-1374, (2d Cir. Jan 13, 2023) ("Raoul Amicus"), in which he stated "empirical evidence supports the determination" that practices that "guard against the sales of qualified purchases straw purchasers . . . will stem the flow of firearms into the illegal market." Raoul Amicus at 7. Indeed, the Illinois Attorney General cited evidence that two firearms stores "accounted for ten percent of all crime guns recovered [in Chicago] during the period between 2013 and 2016." *Id.* at 8 (citing City of Chicago, Gun Trace Report, 2017, at 4, bit.ly/3ItoLS2).

74. He also cited to authoritative studies such as Philip J. Cook et al., *Some Source of Crime Guns in Chicago: Dirty Dealers, Straw Purchasers, and Illegal Traffickers*, Journal of Criminal Law & Criminology, Vol. 104(4): 717, 723 (2015), and stated:

> It is also well-documented that gun dealers contribute to the harm caused by firearms entering the illegal market when they engage in unlawful or irresponsible business practices, such as by selling firearms to known straw purchasers (that is, someone purchasing on behalf of another person) or to

individuals who do not provide appropriate documentation. As to the former, studies confirm that most dealers are confronted at one time or another with individuals whom they believe may be a straw purchaser: In 2011, for example, two-thirds of surveyed gun dealers admitted that they had been approached by possible straw purchasers. While the vast majority of dealers do not sell firearms to such individuals, one study concluded that one in five dealers would sell a firearm to an individual whom they suspected was purchasing it on behalf of someone else, including for those who may not legally be allowed to buy it. One consequence of this conduct in the aggregate is that a large number of firearms enter the illegal market; indeed, by some estimates, nearly half of all guns that are trafficked the secondary market began as straw purchases. But studies show that when gun dealers either are held accountable for their sales to straw purchasers or choose to engage in more responsible business practices that prevent such sales, there is a significant decrease in the flow of firearms into the illegal market.

Raoul Amicus at 9-10 (citations omitted).

75. The scholarly evidence, consistent with the Illinois Attorney General's Amicus Brief, supports a finding that requiring dealers to follow responsible business practices is likely or even certain to reduce both straw purchasing and illegal gun trafficking, for which a small handful of dealers who refuse these practices are responsible.

76. Professor Daniel Webster, SCD, MPH, is a tenured professor at Johns Hopkins and nationally recognized as an authority on firearm violence and strategies to reduce such violence (and also cited in footnote 11 in support of enforcing good practices for gun sellers in the Raoul Amicus Brief). Like the Illinois Attorney General, he also filed an amicus brief in *National Shooting Sports Foundation, Inc. v. Letitia James*, on January 13, 2023 ("Webster Amicus").

77. The Webster Amicus, which set outs Professor Webster's expert opinion, is attached as Exhibit B and incorporated herein to show that requiring Cook County dealers to follow responsible business practices is likely to reduce the level of violence to which Plaintiff D.W. and other children in the proposed class are exposed.

78. As set forth in the Webster Amicus, it is Professor Webster's opinion that a broad consensus supports responsible business practices, and most dealers are knowledgeable as to such practices and comply with them by refusing to sell to persons who are straw purchasers (persons passing background checks but illegally buying guns for others) and gun trafficking (people buying guns to illegal resell without a license). Professor Webster states: "… it is well documented that the industry knows what constitutes—and can implement—lawful and reasonable sales practices." Exhibit B at page 4.

79. As noted by Professor Webster, as well as the Brady Campaign and Brady Center to Prevent Gun Violence Report, "The Truth About Gun Dealers in America, Stopping the Small Number of 'Bad Apples' That Supply Virtually Every Crime Gun in the U.S." ("Exhibit C," hereto), only a few dealers are the problem. Just *five percent* of dealers supply 90 percent of crime guns. They do so without following responsible business practices such as those identified in Exhibit A hereto, while 86 percent of dealers sell no crime guns in a given year. Exhibit C at 2.

80. In the case of the City of Chicago, according to the Gun Trace Reports by the City in 2014 and 2017, which is also cited in the Raoul Amicus Brief, *infra* at 7, approximately 40 percent of the crime guns recovered can be traced to seven suburban gun stores in Cook County, just beyond the jurisdiction of the City of Chicago.

81. These include Chuck's Gun Shop, Midwest Sales, and five others, which Defendant ISP has left free to engage in straw purchases by refusing to require that they engage in well-known responsible business practices.

82. Under the authority of the Firearm Dealer License Certification Act, by administrative rulemaking, Defendant ISP can refuse to renew licenses of dealers who fail to follow the responsible business practices set out by Defendant ISP itself in Exhibit A.

A23

83. Defendant ISP can identify such dealers or deter them from irresponsible practices by requiring that dealers supply records showing that the dealers have looked for indicators of straw purchasing with each such sale and refused sales when such indicators are present.

84. Plaintiff has attached as Exhibit D, hereto, a checklist that was developed by the Brady Center. It is one set of criteria that may be sufficient documentation for renewal of the license, but other forms of record keeping could be used, along with videotaping of sales.

85. As Professor Webster has concluded, it is likely that requiring business practices by these errant dealers will reduce the level of criminal gun violence in urban areas like Chicago. "Illegal sales by licensed dealers are the largest source of guns for criminals; such sales 'account for more guns diverted into the illegally market any other trafficking channel.'" Exhibit B, quoting Webster, *et al.*, *Effects of Undercover Police Stings of Gun Dealers on the Supply of New Guns to Criminals*, Injury Prevention, Vol. 12: 225 (2006). This is especially true because illegally diverted guns are much more likely to be used in crimes. *See,* U.S. Dep't of Justice, Firearm Violence, 1993-2011 at 13 (2013)." *See also*, Exhibit B at 9.

86. In Chicago, the Chicago Police Department engaged in a series of undercover stings at stores suspected of making illegal firearms sales, including straw purchases, and those stings were followed by civil lawsuits against dealers for facilitating such sales.

87. Professor Webster testified with respect to the Chicago stings reporting, "Within one year following the stings, civil lawsuits and criminal indictments, the number of new guns used in crimes [guns recovered less than one year after they were sold] by individuals who were not the criminal gun possessors (a proxy for illegal straw purchases) fell by 61.8 % and the overall number of guns diverted for criminal use decreased by 46.4%." *See,* Webster et al., Undercover Police Singes, *supra*, at 229.

88. Likewise, in Milwaukee shutting down just one dealer (Badger Guns) that was responsible for the majority of guns recovered by police within a year of sale led to a 44 percent reduction in new crime guns citywide.

89. Similarly, in New York City, sting operations against out-of-state dealers resulted in agreements to follow responsible business practices, which in turn reduced the crime guns traced to dealers who signed those agreements by 84.2 percent.

90. Requiring dealers to follow responsible business practice by an administrative regulation for licensee renewal is a cost-effective way of achieving a similar or equally meaningful reduction of illegal crime guns as one-time sting operations against the dealers described above. It is also likely to be less dangerous than an undercover operation, and the effect is likely to be continuing and longer lasting. The reduction in the number of illegal guns and illegal gun violence following such stings is convincing evidence that a similar meaningful reduction will follow administrative regulation of the kind sought here.

91. Furthermore, other studies have documented that a decrease in the number of illegal firearms in high-crime neighborhoods, such as the ten neighborhoods identified above, is correlated with a reduction in gun violence in those neighborhoods.

92. One such study concludes:

"the presence of any firearm in the LC [high risk network of co-offenders'] is associated with increased individual risk of gunshot victimization, that illegally trafficked firearms presented an even greater risk… Our research suggests that interventions aimed at curtailing illegal transfers of firearms could be used to reduce gun availability to criminals and decrease gun violence victimization. In turn, fewer guns on the street could increase the life expectancy of young Black men who are most likely to suffer serious injury and victimization by those who criminally misuse guns. *Reducing firearm trafficking could also reduce the trauma experienced by these individual and other residents of disadvantaged neighborhoods that are particularly vulnerable to persistent gun violence problems*. The case for a supply side approach to gun violence as suggest above is *well supported* by the empirical evidence on illegal

gun market dynamics (Braga et al., 2012, 2002)" (emphasis supplied, original emphasis omitted).

Ciomek, *et al.*, *The Influence of firearms trafficking on gunshot injuries in a co-offending network*, Social Science & Medicine, Vol. 259 2020 https//doi.org/10.1016/socscimed2020.113114. Additional studies include Webster, Vernick, Bulzacchelli & Vittes, *Recent Federal Gun Laws, Gun Dealer Accountability and the Diversion of Guns to Criminals in Milwaukee*, Journal of Urban Health, Vol. 89:87-97; and Irvin, Rhodes, Cheney & Wiebe, *Evaluating the Effect of State Regulation of Federally Licensed Firearm Dealers on Firearm Homicide*, Am. Journal of Public Health Vol. 104(8)."

93. There is a strong correlation between the level of violence and the continued traumatization of Plaintiff and other disabled children living in Chicago's 15 highest crime neighborhoods. Any such reduction in the level of firearm violence will reduce the number of incidents that re-traumatize or re-enforce the trauma from which they already suffer.

94. Defendant ISP has refused to follow other actions directed by law to reduce straw purchasing. Defendant ISP has failed to produce reports required by the Gun Trafficking Information Act, 5 ILCS 830/10-5, that would determine which dealers are responsible for straw purchasing. The Defendant ISP's failure to collect such information identifying specific bad dealers has the effect of protecting these dealers. Defendant ISP also allows dealers to sell ammunition without requiring the dealers to check if the purchasers have valid FOID cards.

95. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, protects an individual with a disability and adopts the definition of a disability under 42 U.S.C.§ 2102(1)(A), which includes any limitation on caring for oneself, sleeping, learning, reading, concentrating, thinking and communicating.

A26

96.  Plaintiff and other children continually exposed to gun violence directly or indirectly have developed these limitations on the activities described in the Americans with Disabilities Act and are disabled within the meaning of 42 U.S.C. §2102.

97.  In violation of Section 504 of the Rehabilitation Act, 29 U.S.C.§ 794, and by the acts set forth above, including the refusal to require dealers to follow responsible business practices that would lead to a reduction in the levels of gun violence to which Plaintiff and other children in the high crime neighborhoods, the Defendant ISP and other Defendants have denied Plaintiff and the proposed class a reasonable accommodation to the mental health needs of these children and prevented them from obtaining the benefits which they would otherwise receive from Defendant ISP's federally assisted law enforcement programs and activities, including firearm dealer training and oversight if properly accommodated to meet their needs.

WHEREFORE, Plaintiff prays this Court to:

A.  Certify under Fed R. Civ. P. Rule 23(b)(2), the class of children under age 18 who currently live in the fifteen highest crime neighborhoods as determined by the City of Chicago and who have experienced and continue to experience disabling trauma within the meaning of the ADA from continued exposure to illegal gun violence.

B.  Declare that by refusing to require dealers to follow responsible business practices likely to reduce the violence to which Plaintiff D.W. and other class members are exposed, the Defendant ISP and other Defendants have denied a reasonable accommodation to Plaintiff D.W. and the proposed class due to them because of such disabling trauma and disability, and prevented them from obtaining the benefits which they would otherwise receive or enjoy from Defendants' federally

assisted law enforcement programs and activities, including firearm dealer training and oversight, if properly accommodated to meet their needs.

C.    Direct that Defendant ISP and other Defendants comply with the Firearm Dealer License Certification Act 430 ILCS 68/5-1, *et seq.*, and require Illinois firearm dealers to use and document their use of responsible business practices with respect to straw purchasing as a condition for renewal of their licenses.

D.    Direct that Defendant ISP and other Defendants take the other measures to deter straw purchasing set forth in Count I above, such as requiring FOID cards to obtain ammunition.

E.    Grant Plaintiff D.W. nominal damages for violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, for which Plaintiff D.W. demands a jury.

F.    Grant Plaintiff such other relief, including legal fees and costs, as may be appropriate.

**COUNT II – Violation of Section 5 of the Illinois Civil Rights Act:**
**Refusal to Require Dealers to Follow Responsible Business Practices**

98.   Plaintiff incorporates by this reference the numbered paragraphs under Count I above.

99.   The acts set forth above have had a disparate adverse effect on Plaintiff D.W. and other Black children who live disproportionately in high crime neighborhoods.

100.  Section 5(a)(2) of the Illinois Civil Rights Act, 740 ILCS 23/5 prohibits the Defendant State and Defendant ISP from using "criteria or methods of administration" that have the effect of discriminating against Plaintiff and other Black children because of their race and allowing a level of violence which Defendants would not tolerate if the children in the proposed class were white.

101.  By such acts set out above, and by refusal to require dealers to follow responsible business practices likely to reduce the level of violence to which Plaintiff and other Black children are now

27

exposed, Defendant ISP in concert with the other Defendants has used "criteria or methods of administration" that have had the effect of discriminating against them because of their race.

WHEREFORE, Plaintiff prays this Court to:

G.    Certify under Fed R. Civ. P. Rule 23(b)(2), the class of children who live in the fifteen highest crime neighborhoods as determined by the City of Chicago and who are exposed to high levels of gun violence due in part to straw purchasing and gun trafficking through licensed dealers.

H.    Declare that by refusing to require licensed dealers to follow responsible business practices pursuant to the Firearm Dealer Licensing Certification Act, the Defendants State and ISP have used criteria and methods of administration that have discriminated against Plaintiff and other Black children because of their race, in violation of Section 5(a)(2) of the Illinois Civil Rights Act, 740 ILCS 5.

I.    Direct that Defendant ISP and other Defendants use their authority under the Firearm Dealer Licensing, 430 ILCS 68-5/60 and require dealers to follow and document that they are following responsible business practices as a condition for renewal of the dealer licenses.

J.    Direct that Defendants State and ISP take the other measures to deter straw purchasing set forth in Count I and incorporated herein by reference.

K.    Grant Plaintiff nominal damages for violation of Section 5(a)(2) of the Illinois Civil Rights Act, for which Plaintiff seeks a jury determination.

L.    Grant Plaintiff such other relief, including legal fees and costs, to which she is entitled.

Dated: October 24, 2023

Respectfully submitted,

By: /s/ *Thomas H. Geoghegan*
    One of Plaintiff's Attorneys

Shira Lauren Feldman
**Brady Center to Prevent Gun Violence**
840 First Street NE, Suite 400
Washington, DC 20002
(202) 370-8100
sfeldman@bradyunited.org

Patrick V. Dahlstrom
**Pomerantz, LLP**
10 S. LaSalle St., Suite 3505
Chicago, IL 60603
(312) 377-1181
pdahlstrom@pomlaw.com

Thomas H. Geoghegan
**Despres, Schwartz & Geoghegan, Ltd.**
77 West Washington Street, Suite 711
Chicago, Illinois 60602
(312) 372-2511
tgeoghegan@dsgchicago.com

Attorneys for the Plaintiff

A30

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Shanice Mathews,* as guardian ad litem and on behalf of her son, D.W., ) ) ) | |
| Plaintiff, ) ) | Case No. 18-CV-6675 |
| v. ) ) | Honorable Joan B. Gottschall |
| The State of Illinois, et al., ) ) | |
| Defendants. ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In her fourth amended complaint, Shanice Mathews seeks injunctive relief against the State of Illinois, its governor, the Illinois Department of State Police ("ISP"), and ISP's director on behalf of her teenaged son, D.W., and a proposed class of persons who live in Chicago's communities of concentrated gun violence. Her claims arise under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Illinois Civil Rights Act of 2003, 740 Ill. Comp. Stat. 23/5(a)(2) (West 2008). Prior opinions recite the factual and procedural background in detail.[1] The third and fourth amended complaints do not vary materially, differing chiefly in the scope and form of injunctive relief Mathews seeks.

After extensive briefing and oral argument, Mathews has clarified that she seeks an injunction ordering that:

---

*In briefing filed earlier in this case, plaintiff's name was sometimes spelled with two t's. *See Mathews v. Illinois*, No. 18-CV-6675, Order at 2 n.1 (N.D. Ill. June 10, 2022) (ECF No. 148). The plaintiff consistently spells her name with one t in her fourth amended complaint and the instant round of briefing. *E.g.*, ECF No. 178 at 1; ECF No. 192 at 1.

1. For background, see *Powell ex rel. D.P. v. Illinois*, 2019 WL 4750265, at *1-5 (N.D. Ill. Sept. 30, 2019), *motion to certify appeal denied*, 2019 WL 10349404 (N.D. Ill. Nov. 5, 2019), *reconsideration denied*, 2019 WL 10349403 (N.D. Ill. Dec. 18, 2019), *appeal dismissed*, No. 19-3144, 2021 WL 4955489 (7th Cir. Aug. 6, 2021); *Mathews ex rel. D.W. v. Illinois*, 690 F. Supp. 3d 808, 810-19 (N.D. Ill. 2023). The original complaint named three plaintiffs, including Mathews. The caption of the opinion dismissing the original complaint in part bore the name of the first-named plaintiff, Demetria Powell. Powell and a co-plaintiff later moved out of Chicago and were dismissed for lack of standing, leaving Mathews as the sole plaintiff. *See Powell*, 2019 WL 4750265, at *7-8.

> Defendant ISP exercise its authority under subparagraphs (1) and (2) of the Dealer License Certification Act 430 ILCS 68/5-85 ("Disciplinary sanctions") and 430 ILCS 68/5-30 ("Training of Certified licensees") and the general rulemaking and enforcement authority of ISP under 20 ILCS 2605-15, to require that licensed gun dealers in counties adjacent to or near Chicago keep and produce electronic records showing that the dealers use the Brady checklist or a similar checklist authorized by the ISP consistent with the "Don't Lie for the Other Guy" video that such dealers are required to view as part of their training under 430 ILCS 68/5-30. Such counties shall include Cook, Will, DuPage, Lake, and Kane Counties. The ISP shall notify dealers in writing that failure to provide such records at the time of relicensing for inspection by ISP will subject the dealers to the disciplinary sanctions set out under 430 ILCS 68-5/85, including the denial of the relicensing of such dealer.

> Defendant ISP, within 30 days of the entry of such order, will submit to the Court a timeline for administrative actions to implement such relief.

Pl. Suppl. Mem. 3-4 (Mar. 19, 2025), ECF No. 209. The proposed regulations will, according to Mathews, decrease straw purchasing[2] from certain firearm dealers near Chicago, and that will in turn reduce the flow of "crime guns" into Chicago and, by extension, the proposed class's exposure to, and continued traumatization by, shootings in Chicago's communities of concentrated gun violence. *E.g.*, *id.* at 4.

Defendants have filed a motion to dismiss the fourth amended complaint for lack of standing to sue under Article III of the Constitution and for failure to state a claim on the merits. The parties dispute, *inter alia*, whether the Illinois legislature has given defendants the authority to promulgate the regulations Mathews proposes. Their arguments focus on a statute enacted after this case was filed, the Illinois Firearm Dealer License Certification Act, 430 Ill. Comp. Stat. 68/5-1 to 5-120 (Westlaw through Pub. Act No. 103-1082) [hereinafter "the Act" or "Dealer Certification Act"]; *see* 2018 Ill. Legis. Serv. P.A. 100-1178 (West Jan. 18, 2019).

The Illinois legislature included in § 5-85 of the Act a list of eleven criteria for which the ISP "may" discipline a firearm dealer, including by declining to renew the dealer's license. The full list follows:

---

2. A straw sale or straw purchase refers to a transaction in which a person buys a gun for someone else and falsely claims to be buying it for himself. *Abramski v. United States*, 573 U.S. 169, 171-72 (2014) (construing 18 U.S.C. § 922(a)(6)).

2

A32

[T]he Illinois State Police may refuse to renew or restore, or may reprimand, place on probation, suspend, revoke, or take other disciplinary or non-disciplinary action against any licensee, and may impose a fine commensurate with the severity of the violation . . . for any of the following . . . :

(1) Violations of this Act, or any law applicable to the sale or transfer of firearms.

(2) A pattern of [sic] practice or other behavior which demonstrates incapacity or incompetency to practice under this Act.

(3) Aiding or assisting another person in violating any provision of this Act or rules adopted under this Act.

(4) Failing, within 60 days, to provide information in response to a written request made by the Illinois State Police.

(5) Conviction of, plea of guilty to, or plea of nolo contendere to any crime that disqualifies the person from obtaining a valid Firearm Owner's Identification Card.

(6) Continued practice, although the person has become unfit to practice due to any of the following:

    (A) Any circumstance that disqualifies the person from obtaining a valid Firearm Owner's Identification Card or concealed carry license.

    (B) Habitual or excessive use or abuse of drugs defined in law as controlled substances, alcohol, or any other substance that results in the inability to practice with reasonable judgment, skill, or safety.

(7) Receiving, directly or indirectly, compensation for any firearms sold or transferred illegally.

(8) Discipline by another United States jurisdiction, foreign nation, or governmental agency, if at least one of the grounds for the discipline is the same or substantially equivalent to those set forth in this Act.

(9) Violation of any disciplinary order imposed on a licensee by the Illinois State Police.

(10) A finding by the Illinois State Police that the licensee, after having his or her certified license placed on probationary status, has violated the terms of probation.

(11) A fraudulent or material misstatement in the completion of an affirmative obligation or inquiry by law enforcement.

3

A33

430 Ill. Comp. Stat. 68/5-85(a).

In effect, Mathews asks the court to order defendants to promulgate regulations adding a twelfth criterion to the above list—making non-renewal of a license mandatory ("must") instead of discretionary ("may") when the new criterion applies. This request runs squarely into a familiar maxim of statutory construction: *expressio unius est exclusio alterius*, meaning roughly that an enumeration of criteria in a statute is interpreted to exclude items not on the list. *See, e.g.*, *Schultz v. Performance Lighting, Inc.*, 2013 IL 115738, ¶ 17. This maxim "expresses the learning of common experience that when people say one thing they do not mean something else." *Id.* (quoting *People ex rel. Sherman v. Cryns*, 786 N.E.2d 139, 155 (Ill. 2003)).

Applying the *expressio unius* maxim to § 5-85 of the Dealer Certification Act, the list of eleven disciplinary criteria is exclusive, and a twelfth criterion may not be added by a court or an administrative agency like the ISP. *See People v. Legoo*, 2020 IL 124965, ¶¶ 26-27; *People v. Clark*, 2019 IL 122891, ¶¶ 23-24. "Administrative regulations can neither expand nor limit the statute they enforce." *Kean v. Wal-Mart Stores, Inc.*, 919 N.E.2d 926, 938 (Ill. 2009) (citing *Outcom, Inc. v. Ill. Dep't of Transp.*, 909 N.E.2d 806 (Ill. 2009)); *accord. Du-Mont Ventilating Co. v. Dep't of Revenue*, 383 N.E.2d 197, 199-200 (Ill. 1978) (citing *Standard Oil Co. v. Dep't of Fin.,* 48 N.E.2d 514 (Ill. 1943)). "Illinois law has long provided that an administrative agency is a 'creature of statute' with 'no general or common-law powers.'" *People v. Muhammad*, 2023 IL App (1st) 220372, ¶ 46, *appeal allowed,* 238 N.E.3d 307 (Ill. 2024) (citing *Goral v. Dart*, 2020 IL 125085, ¶ 33; other citation omitted). An agency like the ISP "is limited to those powers granted to it by the legislature in its enabling statute." *Id.* (quoting *Prate Roofing & Installations, LLC v. Liberty Mut. Ins. Corp.*, 2022 IL 127140, ¶ 22). Thus, the ISP's general rulemaking authority in its organic statute that is, the statute that creates the state police, *see* 20 Ill. Comp. Stat. 2605/2605-15, may not be used, as Mathews suggests, to engraft a license non-renewal rule onto the Dealer Certification Act.

Mathews' reading of the statute suffers from an additional textual flaw. The ordinary meaning of the word "may," which is used thrice in § 5-85(a), denotes non-mandatory discretion.

*E.g.*, *People v. Henry*, 924 N.E.2d 1126, 1131 (Ill. App. Ct. 3d Dist. 2010) (citations omitted). The ISP reads § 5-85's grant of disciplinary authority as discretionary, for it has promulgated a non-exhaustive list of factors to be weighed on a case-by-case basis when deciding what, if any, sanction to impose. *See* Ill. Admin. Code. Tit. 20, § 1232.50(c) (2025). Mathews suggests no way in which a regulation could interpret the word "may" to mean "must not renew" in § 5-85(a), so if it were promulgated, the regulation Mathews proposes would have to be struck down as conflicting with the Act's plain language.

Lacking a textual footing for her argument in § 5-85, Mathews relies on the grant of rulemaking authority on another subject in a different section of the Act, § 5-30: "The Illinois State Police may adopt rules regarding continuing education for certified licensees related to legal requirements and responsible business practices regarding the sale or transfer of firearms." She asserts that this grant of rulemaking power may be used to promulgate a regulation requiring, as a condition of license renewal, firearm dealers to prove that they have complied with their training on detecting straw purchasers.

The Illinois legislature chose to include an express grant of rulemaking authority as to "continuing education" only. *See* § 5-30. Construing the Dealer Certification Act as Mathews proposes would permit the "continuing education" rulemaking power to become a backdoor way of expanding the ISP's regulatory authority over recordkeeping and the statutory criteria for disciplining firearm dealers. As the Illinois Supreme Court has explained, "It is well settled that when the legislature uses certain language in one instance of a statute and different language in another part, we assume different meanings were intended." *People v. Clark*, 2019 IL 122891, ¶ 23 (quoting *People v. Goossens*, 2015 IL 118347, ¶ 12). Properly construed then, § 5-30 of the Dealer Certification Act is a plain grant of rulemaking authority and demonstrates that the Illinois legislature knew how to grant the ISP rulemaking power when it chose to do so. A similar grant of rulemaking authority is conspicuously absent from § 5-85. Under the familiar statutory construction principles discussed in this paragraph, the absence of a grant of

rulemaking authority from § 5-85 indicates that the legislature withheld rulemaking power in § 5-85. Section 5-30 should not be interpreted to override the legislature's decision.

Finally, Mathews cites the Illinois Firearm Dealer Responsibility Act of 2023 (FIRA), P.A. 103-559, § 5, eff. Aug. 14, 2023, which amended the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1 *et seq.*[3] *See* Resp. to Mot. to Dismiss 1-2, 12-13. FIRA declares it to be an "unlawful practice within the meaning of this Act [the Consumer Fraud and Deceptive Business Practices Act] for any firearm industry member" to "knowingly create, maintain, or contribute to a condition in Illinois that endangers the safety or health of the public . . . including failing to establish or utilize reasonable controls." FIRA defines "reasonable controls" as "business practices that are designed to: prevent the sale or distribution of a firearm-related product to a straw purchaser." 815 Ill. Comp. Stat. 505/2DDDD(b)(1)(A). As Mathews acknowledges, however, FIRA added to the list of unlawful practices that may give rise to civil liability to a private plaintiff who experiences "actual damages," but FIRA does not modify the criteria the ISP should apply when deciding whether to renew a dealer's license.[4] 815 Ill. Comp. Stat. 505/10A(a); *see* Resp. to Mot. to Dismiss 7.

In sum, the regulation Mathews proposes, via an injunction, would effectively amend the Dealer Certification Act by adding a rule forbidding license renewal in a specified situation.

---

3. The title "Illinois Firearm Dealer Responsibility Act" appears to be informal. The enacted bill does not specify a short title. Furthermore, as originally enacted, the Act amended § 2BBBB of the Consumer Fraud and Deceptive Business Practices Act. *See* P.A. 103-559, § 5, eff. Aug. 14, 2023. This amendment was subsequently recodified effective July 1, 2024, with immaterial changes, as 815 Ill. Comp. Stat. 505/2DDDD. *See* P.A. 103-605, § 630, eff. July 1, 2024.

4. Mathews contends that "[i]t would be an abuse of discretion for the State Police to license dealers that engage in an 'unlawful practice,' or to fail to inquire at the time of the license renewal as to whether the dealers are engaging in such an 'unlawful practice.'" Resp. to Mot. to Dismiss 2. This argument boils down to the contention that this court should tell defendants how to exercise their prosecutorial discretion when deciding whether to renew a firearm dealer's license. As explained in the opinion dismissing the third amended complaint, *United States v. Texas*, 599 U.S. 670 (2023), forecloses this relief, for that case's holding deprives Mathews of standing to seek an injunction requiring "defendants to fine, suspend, and discipline gun dealers for violations of extant state law." *Mathews ex rel. D.W. v. Illinois*, 690 F. Supp. 3d 808, 828 (N.D. Ill. 2023).

A36

Such a rule would exceed the scope of the administrative rulemaking authority granted by the Dealer Certification Act. *See Kean*, 919 N.E.2d at 937. Defendants therefore lack the authority under Illinois law to promulgate the regulation Mathews requests.

From this construction of the Dealer Certification Act it follows that Mathews lacks Article III standing to pursue the injunctive relief she seeks. The analysis begins with bedrock standing principles:

> Article III of the Constitution limits the jurisdiction of the federal courts to "cases" or "controversies." U.S. Const. Art. III, § 2, cl. 1. The doctrine of standing enforces this case or controversy requirement. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 55962 (1992). Article III standing doctrine developed to "ensure that federal courts do not exceed their authority as it has been traditionally understood" and "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Spokeo*, 578 U.S. at 338 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S 398, 408 (2013); other citations omitted) . . . Mathews must establish three elements that together comprise "the irreducible constitutional minimum of standing." *Lujan*, 504 U.S. at 560. These elements are: (i) that the plaintiff "suffered an injury in fact that is concrete, particularized, and actual or imminent;" (ii) "that the injury was likely caused by the defendant;" and (iii) "that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan*, 504 U.S. at 560–61).

*Mathews ex rel. D.W. v. Illinois*, 690 F. Supp. 3d 808, 820 (N.D. Ill. 2023) (paragraph break and some internal citations omitted).

"[T]o establish injury in fact when seeking prospective injunctive relief, a plaintiff must allege a 'real and immediate' threat of future violations of their rights . . . ." *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1074 (7th Cir. 2013) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102-03 (1983)). As she did in her prior complaints, Mathews alleges that "past and continued exposure [to gun violence] has impaired [D.W.]'s basic life activities and threatens to make his condition more severe." Fourth Am. Compl. ¶ 67; *see also id.* ¶¶ 57–61. The fourth amended complaint's allegations mirror those this court held sufficient to allege a concrete and particularized injury in fact in the third amended complaint. *Mathews,* 690 F. Supp. 3d at 828. This court's reasoning applies with equal force to the fourth amended complaint. *See id.*

"To satisfy the causation element, the plaintiff's injury must be 'fairly traceable' to the challenged action of the defendant, and not the result of the independent action of some third party before the court." *Id.* (quoting *Lujan*, 504 U.S. at 560). By contrast, the redressability component of Article III standing requires the plaintiff to show that it "is likely, not merely speculative, that [her] injury will be redressed by a favorable decision." *In re Recalled Abbott Infant Formula Prods. Liab. Litig.*, 97 F.4th 525, 528 (7th Cir. 2024) (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)).

Standing is absent where an injunction against the defendants named in the complaint would not be likely to redress the plaintiff's concrete and particularized injury. *See, e.g.*, *Lujan*, 504 U.S. at 568-70. Mathews has not made the required showing. She pleads that children like her son who live in Chicago's communities of concentrated gun violence are re-traumatized on a weekly, and sometimes daily, basis. It is this ongoing exposure to gun violence that the injunction must appreciably abate. The fourth amended complaint traces this injury to defendants as follows: (1) crime guns flow into Chicago and are sometimes used in D.W.'s and class members' neighborhoods; (2) some crime guns are obtained in straw purchases; (3) a disproportionate number of the straw purchases occur at seven firearm dealers[5] in Chicago's suburbs; and (4) defendants fail to regulate those seven dealers in a manner that would decrease the rate of straw purchases. *See* Fourth Am. Compl. ¶¶ 68-97. Because, as explained above, defendants have no authority to promulgate the regulations Mathews proposes, D.W.'s injuries and those of the putative class cannot be redressed by the injunction Mathews seeks. Only the Illinois legislature can give defendants the authority to promulgate Mathews' proposed regulations.

For all of the foregoing reasons, defendants' motion to dismiss the fourth amended complaint for want of Article III standing is granted. Mathews has repeatedly failed to cure

---

5. At oral argument, defendants' attorney told the court that that, according to press reports, one of the seven allegedly problematic gun dealers listed in the fourth amended complaint, Chuck's Gun Shop in Riverdale, recently closed. *See* Tr. of Oral Arg. 19-20, ECF No. 211.

A38

standing defects in her complaints.  Accordingly, judgment will be entered dismissing this case without prejudice for want of subject matter jurisdiction.

Date: June 13, 2025                              /s/ Joan B. Gottschall
                                                 United States District Judge

A39

ILND 450 (Rev. 10/13) Judgment in a Civil Action

## IN THE UNITED STATES DISTRICT COURT
### FOR THE
### NORTHERN DISTRICT OF ILLINOIS

Shanice Mathews, as guardian ad litem and on
behalf of her son, D.W.,

Plaintiff(s),

v.

The State of Illinois, et al,

Defendant(s).

Case No.  18 cv 6675
Judge Joan B. Gottschall

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐  in favor of plaintiff(s)
and against defendant(s)
in the amount of $         ,

which ☐ includes          pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☐  in favor of defendant(s)
and against plaintiff(s)

.

Defendant(s) shall recover costs from plaintiff(s).

---

☒  other:  This case is dismissed without prejudice for want of subject matter jurisdiction.

---

This action was *(check one)*:

☐ tried by a jury with Judge        presiding, and the jury has rendered a verdict.
☐ tried by Judge        without a jury and the above decision was reached.
☒ decided by Judge Joan B. Gottschall on a motion to dismiss [184].

Date:   6/13/2025

Thomas G. Bruton, Clerk of Court

Marlan Cowan, Deputy Clerk

A40

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SHANIECE MATHEWS as guardian *ad litem* on behalf of her son, D.W. as well as on behalf of a class of similarly situated children, | ) ) ) | |
| | ) | Case No. 18-cv-6675 |
| Plaintiff, | ) | |
| | ) | Honorable Joan B. Gottschall |
| v. | ) | |
| | ) | |
| THE STATE OF ILLINOIS; THE ILLINOIS DEPARTMENT OF STATE POLICE; J.B. PRITZKER, Governor of the State of Illinois; and BRENDAN KELLY, Director of the Illinois Department of State Police, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF APPEAL

Notice is hereby given that the plaintiff Shaniece Mathews as guardian *ad litem* on behalf of her son, D.W., in the above-named case hereby appeals to the United States Court of Appeals for the Seventh Circuit from the final judgment entered in this action on Jun 13, 2025.

Dated: July 11, 2025                    Respectfully submitted,

                                        By: /s/ *Thomas H. Geoghegan*
                                        One of Plaintiff's Attorneys

Shira Lauren Feldman                    Thomas H. Geoghegan
**Brady Center to Prevent Gun Violence**   **Despres, Schwartz & Geoghegan, Ltd.**
840 First Street NE, Suite 400          77 West Washington Street, Suite 711
Washington, DC 20002                    Chicago, Illinois 60602
(202) 370-8100                          (312) 372-2511
sfeldman@bradyunited.org                tgeoghegan@dsgchicago.com

Patrick V. Dahlstrom
**Pomerantz LLP**
10 S. LaSalle St., Suite 3505
Chicago, IL 60603
(312) 377-1181
pdahlstrom@pomlaw.com

**Attorneys for the Plaintiffs**

A41