No. 25-2182

---

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

SHANICE MATHEWS, as guardian ad litem and on behalf of her son,
D. W.,

Plaintiff - Appellant

v.

STATE OF ILLINOIS, et al.,

Defendant-Appellees

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
District Court Case No: 1:18-cv-06675
Honorable Joan B. Gottschal

---

## REPLY BRIEF OF PLAINTIFF-APPELLANT/CROSS-APPELLEE

---

Thomas H. Geoghegan
**DESPRES, SCHWARTZ &**
**GEOGEHEGAN, LTD.**
77 West Washington Street
Suite 711
Chicago, Illinois 60602
Tel.: (312) 372-2511
tgeoghegan@dsgchicago.com

Patrick V. Dahlstrom
**POMERANTZ LLP**
10 South La Salle Street
Suite 3505
Chicago, Illinois 60603
Tel.: (312) 377-1184
pdahlstrom@pomlaw.com

i

# TABLE OF CONTENTS

TABLE OF CONTENTS.......................................................................... ii

TABLE OF AUTHORITIES ............................................................... iii

INTRODUCTION ................................................................................ 1

ARGUMENT ...................................................................................... 5

I.    ISP has Authority to Require Gun Dealers
to Use the Brady Checklist ............................................................ 5

II.   Plaintiff has Stated a Claim Under
Section 504 of the Rehabilitation Act ...................................... 17

    A.    Failure to enforce gun dealers' reasonable
business practices causes discriminatory
impact and denies a reasonable accommodation
to D.W. and other Black children. ................................ 21

    B.    Plaintiff is entitled to enforcement of a licensing
program that requires dealers to employ reasonable
business practices. ........................................................ 24

III.  Plaintiff has Stated a Claim Under
Illinois Civil Rights Act of 2003 .............................................. 25

IV.  Plaintiff has Standing to sue Under the Rehabilitation
Act of 1973 and the Illinois Civil Rights Act of 2003 ............... 28

CONCLUSION ................................................................................. 34

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A. H. by Holzmueller, v. Ill. High School Ass'n,*
881 F.3d 587 (7th Cir. 2018) ............................................................. 18

*Alexander v. Choate,*
469 U.S. 287 (1985) ............................................................................ 24

*Allen v Wright,*
468 U.S. 737 (1984) ............................................................................ 20

*Bd. of Trs. Of the Univ. of Illinois v. Illinois Educ. Labor Relations Bd.,*
274 Ill. App. 3d 145, 653 N.E.2d 882 (Ill. App. Ct. 1995) ................. 7, 9

*Begg v. Bd. of Fire & Police Comm'rs,*
99 Ill. 2d 324, 76 Ill. N.E.2d 925 (1984) ............................................. 7

*Bennett v. Spear,*
520 U.S. 154 (1997) ............................................................................ 31

*Briggs v. State,*
323 Ill. App. 3d 612, 752 N.E.2d 1206 (Ill. App. Ct. 2001) ................. 12

*Central Austin Neighborhood Ass'n v. City of Chicago,*
2013 App (1st) 123041, 1 N.E.3d 976
(Ill. App.  2013) ................................................................................ 27

*Daniels v. Indus. Comm'n,*
201 Ill. 2d. 160 (2002) ....................................................................... 7

*Department of Commerce v. New York,*
588 U.S. 752 (2019) ............................................................................ 31

*Eastman Kodak Co. v. Fair Employment Practices Comm'n,*
86 Ill. 2d 60, 426 N.E.2d 877 (1981) ............................................ 3, 5, 25

*FDA v. Alliance for Hippocratic Medicine,*
602 U.S. 367 (2024) ...................................................................... 29, 32

*Julie Q. v. Dep't of Children and Family Servs.,*
2011 App (2d) 100643, 963 N.E.2d 401
(Ill. App. Ct. 2011) ......................................................................... 12, 14

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ............................................................................. 29

*Mathews v. Illinois,*
Case No. 18 C 6675 (N.D. Ill. Aug. 18, 2022) ................................... 22

*Minifee v. Doherty,*
333 Ill. App. 3d 1086, 777 N.E.2d 510 (Ill. App. Ct. 2002) .......... 12, 14

*National Association for the Advancement of Colored People v.
Acusport, Inc.,* 271 F. Supp. 2d 435 (E.D.N.Y. 2003) ........................ 33

*People v. Bair,*
379 Ill. App. 3d 51, 884 N.E.2d 184 (Ill. App. Ct. 2008) ................... 12

*People v. Henry,*
398 Ill. App. 3d 1019, 924 N.E.2d 1126 (Ill. App. Ct. 2010) ............ 3, 6

*Powell v. Illinois,*
2019 U.S. Dist. LEXIS 168209 (N.D. Ill. Sept. 30, 2019) ................... 21

*Satanic Temple v Rokita,*
164 F.4th 1061 (7th Cir. 2026) ........................................................... 20

*Smith v. City of Jackson,*
544 U.S. 228 (2005) ............................................................................ 26

*Washington v. Ind. High Sch. Athletic Ass'n, Inc.,*
181 F.3d 840 (7th Cir. 1999) ...................................................... 18, 22

*WildEarth Guardians v. United States Forest Service,*
70 F.4th 1212 (9th Cir 2023) .............................................................. 32

*Wis. Cmty. Serv. v. Milwaukee,*
465 F.3d 737 (7th Cir. 2006) .................................................. 18, 19, 22

*Zuckerman v. United of Omaha Life Ins. Co.,*
2012 U.S. Dist. LEXIS 128204 (N.D. Ill. 2012) ......................... *passim*

## Statutes

29 U.S.C. § 794 ................................................................... *passim*

42 U.S.C. § 12101 ..................................................................... 1, 19

20 ILCS 2605/ ...................................................................... *passim*

430 ILCS 68/5 ...................................................................... *passim*

720 ILCS 5/24 ............................................................................. 14

740 ILCS 23/5 ...................................................................... *passim*

815 ILCS 505 ......................................................................... 15, 23

## INTRODUCTION

With all its obfuscation retracing the history of the litigation, the Defendant cannot hide the fact that it simply does not care about having gun dealers employ the simplest means of checking for straw sales, *i.e.,* employing the Brady Checklist, when they sell guns to halt straw sales and the ensuing gun violence in Chicago communities. These are neighborhoods where Plaintiff's son D.W. and other Black children in the proposed Class live and are continually traumatized by the violence and deaths of Black children caused by straw sale gun violence and killings. D.W. and other Black children in the proposed Class have documented Post Traumatic Stress Delayed ("PTSD") or PTSD symptoms, caused by trauma-induced mental impairment that limits their ability to sleep, speak, learn, read, concentrate, think, communicate, and participate fully in school. *See* Cplt. ¶¶ 84, 86, 98, 111. As such, they are disabled per Section 504(a) of the Rehabilitation Act, 29 U.S.C. § 794, and, by incorporation, 42 U.S.C. § 12101(1)(A). Yet, Defendant will not make this simplest of accommodations to D.W. or other Black children and have gun dealers use the Brady Checklist.

Defendant Illinois State Police (the "ISP" or "State Police") can, and has a duty to, accommodate those disabilities under the Rehabilitation Act and the Section 5(a)(2) of the Illinois Civil Rights Act of 2003 (ICRA), 740 ILCS 23/5(a)(2), by enforcing the Firearm Dealer License Certification Act, 430 ILCS 68/5, *et seq.* ("FDLCA"). ISP's refusal to accommodate D.W.'s and other Black children in the proposed Class's disabilities constitutes a prohibited form of discrimination under the Rehabilitation Act.

The State Police, however, have failed to take any pre-emptive action to have gun dealers use the Brady, or a Brady-like, Checklist to stop straw sales, even after a guilty plea agreement entered in a criminal action in the Northern District of Illinois admitted to making 27 straw purchases from suburban Chicago gun shops 3 years ***after*** Plaintiff filed her complaint in this action. *See* Opening Brief of Plaintiff-Appellant/Cross-Appellee ("Opening Brief") at 7 and n. 1, ECF No. 16. The ISP continues its dereliction of duty under Illinois state law, which causes and discriminatorily exacerbates D.W.'s and other Black children's disabilities. The State Police not only refuse to act proactively to stop straw sales, but attempt to justify their abdication of protecting Black

children by espousing tortured mental gymnastics to justify their inertia and passivity when the case law clearly holds "that [ISP] has the authority '[t]o promulgate rules and regulations necessary for the administration and the enforcement of its powers and duties, whenever granted and imposed.'" *People v. Henry,* 398 Ill. App. 3d 1019, 1021, 924 N.E.2d 1126, 1128, 338 Ill. Dec. 600, 602 (2010) (citing *Eastman Kodak Co. v. Fair Employment Practices Comm'n*, 86 Ill. 2d 60, 70, 426 N.E.2d 877, 882, 556 Ill Dec. 552, 557 (1981)).

While gun violence is an existential threat to Black children in Chicago that justifies using all means necessary to end it, the ISP does nothing. It is not simply a failure to accommodate. The State Police does not take any measures to protect Black children from the violence caused by straw sales. The ISP not only fails to adopt the simplest and most efficient means of accommodation by enforcing responsible business practices, but it refuses even to try. Employing responsible business practices is not a foreign concept to the ISP, nor to its counsel in the instant action. The Illinois State Attorney General's amicus brief in the Second Circuit Court of Appeals attests that engaging in responsible business practices lowers the gun violence to which D.W. and other Black

children are exposed daily in Chicago. See ECF No. 16 at 27. Attorney General Raoul, moreover, has averred that "empirical evidence" shows that preventing straw gun purchases will reduce the flow of guns and, thereby, reduce gun violence. Id. Accordingly, it is beyond peradventure that the ISP's failure to have gun dealers employ the Brady Checklist is intentional.

Contrary to the holding below, Plaintiff never sought to require mandatory non-renewal of gun licenses. Order at 4-5 (A34-A35). Plaintiff argued that renewal or non-renewal was well within the ISP's discretion. Plaintiff sought to have ISP tell gun dealers to use the Brady Checklist each time they sell a gun to ensure reasonable business practices are employed in every sale of a weapon in Illinois, as is required under the FDLCA, to prevent the straw sales.

The crux of the District Court's decision dismissing Plaintiff's complaint rests on whether the ISP has the authority to have gun dealers use the Brady Checklist to ensure that reasonable business practices are employed in the sale of guns. *See* Order at 8 (A 37). In earlier Memoranda and Orders, the District Court found that Plaintiff had adequately alleged traceability and redressability. In dismissing the Fourth

Amended Complaint, the District Court ruled that the ISP lacked such authority. *Id.* Accordingly, if the ISP has the authority to have gun dealers use the Brady Checklist, Plaintiff can satisfy traceability and redressability requirements and thereby establish Article III standing.

As argued herein, because the ISP has such authority, Plaintiff has standing to prosecute her cause of action. Accordingly, the District Court's decision should be reversed, and the case remanded to adopt the Brady or Brady-like Checklist for use by gun dealers.

## ARGUMENT

### I. ISP has the Authority to Require Gun Dealers to Use the Brady Checklist

In *People v. Henry*, the court addressed the ISP's rulemaking authority under the Department of State Police Law, 20 ILCS 2605/2605-15 (West 2006), and held that the ISP "has the authority '[t]o promulgate rules and regulations necessary for the administration and the enforcement of its powers and duties, whenever granted and imposed.'" 924 N.E.2d at 1128 (quoting *Eastman Kodak Co.*, 426 N.E.2d at 882). The Illinois Supreme Court in *Eastman* supported the promulgation of regulations pursuant to legislative intent and, while acknowledging that an agency's regulations may not exceed or alter statutory power,

emphasized that an agency's rulemaking must be evaluated to determine whether the "rules and regulations are in 'clear contravention of the spirit and letter of the act' as to make them unlawful." *Id.* at 882 (quoting *Ruby Chevrolet, Inc. v. Dep't of Revenue*, 6 Ill. 2d 147, 151 (1955)). The full appellate panel in *Henry* reiterated this point in considering legislative intent, see 398 Ill. 3d at 1026 (Wright, dissenting), as did the Seventh Circuit in *Zuckerman v. United of Omaha Life Ins. Co.,* No. 09 cv 4819, 2012 U.S. Dist. LEXIS 128204, at *10 (N.D. Ill. 2012) (noting "[T]o determine whether a regulation follows the statute, a court must ascertain and give effect to the legislature's intent") (quoting *Henry,* 924 N.E.2d at 1130).

The General Assembly adopted the FDLCA, 430 ILCS 68/5-60, in part, to stop illegal gun trafficking by requiring dealers to adopt responsible practices that would reduce the diversion of legal firearms to the illegal market through theft, loss, or straw sales. The FDLCA authorizes the ISP to take action against illegal practices, including straw sales, and vests the ISP with the power and duty to require gun dealers to employ responsible business practices, including adopting continuing education on responsible business practices. *See* 430 ILCS

65/5-30. Indeed, the FDLCA and the Department of State Police Law authorize the ISP to regulate the use of responsible business practices by gun dealers to prevent the sale of straw guns, *i.e.,* to prevent a violation of "any law applicable to the sale or transfer of firearms." 430 ILCS 68/5-85(a)(1). Straw sales are transfers of firearms in violation of both state and federal law.

Moreover, as this Circuit noted in *Zuckerman*, "[T]he party challenging the validity of a regulation bears the burden of proving its invalidity." 2012 U.S. Dist. LEXIS 128204, at *9 (quoting *Bd. of Trs. Of the Univ. of Illinois v. Illinois Educ. Labor Relations Bd.*, 274 Ill. App. 3d 145, 653 N.Ed.2d. 882, 884, 210 Dec. 687 (Ill. App. Cr. 1995) (citing *Begg v. Bd. of Fire & Police Comm'rs*, 99 Ill. 2d 324, 331-32, 459 N.E.2d 925, 928, 76 Ill. Dec. 790 (Ill. 1984)). The Seventh Circuit further noted, [U]nder Illinois law, this is a heavy burden," which, like in *Zuckerman*, "Defendant fail[] to carry" here. *Id.*, at *10.

Defendant's reliance on *Daniels v. Indus. Comm'n*, 201 Ill. 2d. 160, 165 (2002), *see* Combined Responsive and Opening Brief (the "Combined Response") at 30, is misplaced. Aside from a reiteration of the principle that an administrative agency's powers "are those granted to it by the

legislature," *id.,* the facts in *Daniels* revolved around an Industrial Commission's chairman who attempted to designate an arbitrator as an acting commissioner. *Id.*, at 163. The Illinois Supreme Court held that the chairman "had no power to designate" the arbitrator as a successor acting commissioner. Instead, under the applicable law, it was up to the Governor to appoint a replacement . . . with the consent of the Senate." *Id.*, at 164. Here, the applicable law, *i.e.*, the FDLCA, vests the ISP with the power to license gun dealers and requires that responsible business practices be employed in the sale of guns and in the prevention of straw gun sales. Indeed, the FDLCA mandates that the ISP establish "statewide compliance standards" related to, *inter alia*, halting straw purchases. 430 ILCS 68/5-60.

The State Police Law explicitly states that ISP "shall exercise the rights, powers, and duties that have been vested in the Illinois State Police by . . . The Firearm Dealer License Certification Act." 20 ILCS 2605/2605-10(a). With respect to "Rules and regulations," the statute authorizes the ISP: [T]o promulgate rules and regulations necessary for the administration and enforcement of its powers and duties, wherever granted and imposed, pursuant to the Illinois Administrative Procedure

Act." 20 ILCS 2605/2605-15. Therefore, the State Police Law specifically authorizes the ISP to exercise the rights, powers, and duties in the FDLCA and promulgate rules and regulations necessary for the administration and enforcement of those powers and duties. Moreover, the Seventh Circuit held that such administrative regulations carry "the same presumption of validity as a statute, and so long as the regulation furthers the purpose of the statute and is not arbitrary, unreasonable, or capricious, it will be sustained." *Zuckerman*, 2012 U.S. Dist. LEXIS 128204, at *10 (quoting *Bd. of Trs. Of the Univ of Illinois*, 653 N.E.2d at 884).

Here, there is no question that the ISP is authorized to require gun dealers to use responsible business practices and stop straw sales. Their employment of the Brady checklist by gun dealers is a means to that end, and well within the ISP's authority. Yet the ISP claims instead that issuance of a yearly license is "mandatory"; that once "a dealer submits a valid federal firearms license and application for certification, the State Police 'shall' issue a certificate of license." Combined Response at 31. But that's not what the text of the FDLCA says. 430 ILCS 68/5-10 states: "Each licensee shall file with the Illinois State Police a copy of its [Federal

Firearm License (FFL)], together with a sworn affidavit indicating that the license presented is in fact its license and that the license is valid . . . . Upon receipt and review by the Illinois State Police, the Illinois State Police shall issue a certificate of license to the licensee, allowing the licensee to conduct business within this State." *Id.* The term "mandatory" does not appear in the text of the statute. Section 5-10 only refers to an affidavit related to the FFL's validity; it is silent with respect to an "application."

Moreover, Section 5-15(h), cited by the ISP in support of its claim of "mandatory" issuance, is silent on any required filing by the licensee or on mandatory issuance of a license. The section generally addresses a revoked license. Section 5-15(i), also cited by the ISP, identifies information to be submitted by affidavit with an application. Neither § 5-15(h), § 5-15(i), nor § 5-40(a) states, let alone supports, Defendant's interpretation that issuance of a certificate of license is mandatory upon filing "a valid federal firearms license and application for certification." Combined Response at 31. Indeed, mandatory issuance of a certificate of license is inconsistent with the purpose of the FDLCA. The FDLCA was enacted to regulate firearm sales and ensure that dealers comply with

10

state laws, including preventing straw purchases. The ISP makes a mockery of its role in regulating gun dealers when it claims licensing is mandatory upon submission of the FFL. If that were the case, the FDLCA would be rendered superfluous, and there would be nothing the ISP could do once the FFL is confirmed via affidavit to ensure that dealers have complied with state laws.

ISP's reading of the FDLCA requires it to interpret individual sections of the statute and fill in the missing connections to support its claim that re-licensing is mandatory. For example, gun dealers may be required to comply with, *inter alia*, video recording and record-keeping requirements, but § 5-10 does not specifically state that any proof of such compliance is required to issue a license. ISP interprets the statute as making relicensing mandatory, even though it is vested with the power and duty to enforce gun dealers' use of responsible business practices. Plaintiff interprets the statute as giving ISP the authority to have gun dealers employ the Brady Checklist. The intent of the statute is the essential foundation for such statutory interpretation.

In *Zuckerman*, the Seventh Circuit stated that, "[A]n agency has the inherent authority and is given wide latitude and discretion to adopt

regulations that are reasonably necessary to perform its statutory duties." 2012 U.S. Dist. LEXIS 128204, at *10 (quoting *Julie Q. v. Dep't of Children and Family Servs.* 963 N.E.2d 401, 411, 357 Ill. Dec. 629, 2011 IL App (2d) 100643 (Ill. App. Ct. 2011)). Such "[a]gency authority extends to that conferred by 'fair implication and intendment . . . for the purpose of carrying out and accomplishing the objective for which agencies were created.'" *Id.* (citing *Briggs v. State*, 323 Ill. App. 3d 612, 752 N.E.2d 1206, 257 Ill. Dec. 26 (Ill. 2001)). Moreover, "[i]f it can be reasonably done, a court has a duty to affirm the validity of administrative regulations." *Id.*, at *10-*11 (citing *Minifee v. Doherty*, 333 Ill. App. 3d 1086, 777 N.E.2d 510, 267 Ill. Dec. 707 (Ill. App. Ct. 2002)).

As *People v. Henry* counseled, "to determine whether a regulation follows the statute, a court must ascertain and give effect to the legislature's intent." 924 N.E.2d at 1130 (citing *People v. Bair*, 379 Ill. App. 3d 51, 60, 884 N.E.2d 184, 193, 318 Ill. Dec. 629 (2008)). Here, the legislative intent is clear. A principal reason the legislature passed the FCLCA was to have ISP regulate gun dealers by requiring them to employ reasonable business practices to prevent straw sales. To that end, it is reasonable for the ISP, in the performance of its licensing duties

under the FDLCA, to adopt the Brady Checklist when gun dealers sell weapons. It is a reasonable measure to accomplish the objectives of ensuring the use of reasonable business practices and preventing straw sales.

The Defendant's references to 11 specific offenses under § 5-85 to "refuse to renew . . . reprimand, place on probation, suspend, revoke, or take other disciplinary or non-disciplinary action against any [dealer]," Combined Response at 7 (quoting § 5-85(a), is of no moment. The first specific offense, "[V]iolations of this Act, or any law applicable to the sale or transfer of firearms," *see* § 5-85(1), is one expression of the legislative intent that induced the FDLCA and supports the ISP in adopting the Brady Checklist. Plaintiff never sought nor argued to expand the specific offenses in § 5-85, or that failing to employ the Brady checklist would result in a mandatory refusal to renew a gun dealer's license. *See, e.g.*, Opening Brief at 15. Indeed, Plaintiff has consistently argued that § 5-85(a) demonstrates that the ISP has discretion in how it handles any of the offenses. *Id.* The use of the Brady Checklist is a prophylactic measure to ensure responsible business practices and prevent violations of a "law applicable to the sale or transfer of firearms." *See* § 5-85(1). It is a means

of preventing a straw purchase in violation of 720 ILCS 5/24-3.5(b). As it is undoubtedly the legislature's intent in passing the FDLCA to have gun dealers use reasonable business practices, having gun dealers use the Brady Checklist would be a valid ISP regulation that the District Court should have affirmed. *See Zuckerman*, 2012 U.S. Dist. LEXIS 128204, at *10-*11 (citing *Julie Q.* 963 N.E.2d at 411 and *Minifee*, 777 N.E.2d at 267) (explaining the "duty to affirm the validity of administrative regulations").

Curiously, Defendant argues that the ISP can only enforce the FDLCA "through adjudicatory proceedings to determine whether a specific dealer 'violated' or 'failed to comply.'" Combined Response at 8. Query how the ISP would know whether a gun dealer fails to comply? With respect to straw sales, ISP only knows after the fact whether a straw sale has occurred. That is, only after a gun has been retrieved during a search-and-seizure operation or after a crime has been committed. No one denies that straw purchases are illegal or that gun dealers may be criminally liable for failing to use "reasonable controls." *Id.* But ISP appears to only address these issues after a gun dealer has already violated the FDLCA or other Illinois law and made a straw sale.

This means that ISP is not taking actions to ***prevent*** the gun violence and killings that cause the disabilities of D.W. and other Black children.

In a cynical blame-the-victim line of reasoning, Defendant argues that it is D.W. and other Black children who should sue gun dealers under the Consumer Fraud and Deceptive Practices Act as amended by the Firearm Industry Responsibility Act, 815 ILCS 505/2DDDD (FIRA). *Id.* at 9. Having failed to prevent straw sales and the resulting gun violence that traumatizes D.W. and Black children, ISP wants to wash its hands of responsibility and tell children to go to civil court and show they "suffer 'actual damage' as a result of a dealer's violation." *Id.* ISP is telling children they're on their own because it has chosen not to fulfill its duty and do anything to prevent straw sales.

There is no disagreement that ISP has the discretion to deny re-licensing of gun dealers who do not follow reasonable business practices. *See* § 5-85(a). There is also no disagreement that the ISP does not do anything to ensure that gun dealers are employing reasonable business practices. Gun dealers are merely required to complete a form where they note whether their employees have watched a video about straw sales and pay a re-licensing fee. The result is that gun dealers allow straw

sales, and the ISP continues to re-license them because they say their employees watched a video. Their response to parents and children traumatized by gun violence and killings from straw sales is you're on your own. Go sue them yourselves. Combined Response at 9, *supra*.

Pelcher's Shooting Supply of Lansing, IL, is a prime example of the ISP's abject failure to enforce the law. Pelcher's was identified in the Plaintiff's Complaint as one of seven "stores selling the most crime guns recovered in Chicago shootings," as set out in Gun Trace Reports issued by the City of Chicago. Cplt. ¶ 29, (A8-A9). Pelcher's was one of the stores listed in the guilty Plea Agreement for a straw purchase in 2021. *See* Opening Brief at 7, n.1 (citing Plea Agreement that identified gun shops with straw sales). Even with the straw sale being specifically noted in a Northern District of Illinois guilty plea, Pelcher's was re-licensed by the ISP and continues selling guns today.

Each of the other gun dealers listed as the source of the 27 straw purchases in the Plea Agreement is still licensed by the ISP and selling guns in the Chicago suburbs.[1] Thus, even though there is evidence of

---

[1] Shoot Point Blank gun dealers rebranded in 2022 as Range USA. *See* Range USA – Indoor Shooting Range & Gun Store, *Shoot Point Blank has rebranded*. Rangeusa.com (2022);

straw sales in the Plea Agreement, there is no evidence of individualized adjudicatory proceedings by the ISP to determine whether any of the gun dealers violated the FDLCA or failed to comply with the conditions required in the FDLCA. 430 ILCS 68/5-95(b)-(e), 5-100(a). Given the Plea Agreement, it is reasonable to expect that an adjudicatory proceeding would be all but automatic. Each of the gun dealers who were identified as having made straw sales in the Plea Agreement, however, remains licensed in Illinois by the ISP.

## II. Plaintiff has Stated a Claim Under Section 504 of the Rehabilitation Act

ISP's failure to enforce reasonable business practices has a discriminatory impact on D.W. and other Black children in the proposed Class and denies a "reasonable accommodation" to their disabilities. Under Section 504, a plaintiff can state a claim by alleging "(1) [Defendant] intentionally acted on the basis of the disability, (2) [Defendant] refused to provide a reasonable modification, or (3) the [Defendant's] rule disproportionately impacts disabled people." *A. H. by Holzmueller, v. Ill. High School Ass'n*, 881 F.3d 587, 592 (7th Cir. 2018)

---

https://rangeusa.com/tranition?srsltid=AfmBOooLYye7awq1F873Gyf9-bBGMaqZN31aP64QzZ8PAfP_O9orVtu.

(citing *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 847 (7th Cir. 1999)). Section 504 protects "any individual" who is "denied the benefits . . . any program or activity," or "subjected to discrimination" under any program or activity. *Id.* D.W. is an individual who is being denied the benefits of a program or activity, or subjected to discriminatory impact in an unjustified way, because of how the ISP is conducting the program.

Defendant has conducted a program or activity receiving federal assistance in a manner that has a disparate impact, inflicts special injury, and fails to make a reasonable accommodation. *See Wis. Cmty. Serv. v. Milwaukee,* 465 F.3d 737, 751-53 (7th Cir. 2006) (explaining, *inter alia*, the independent basis of reasonable accommodation and noting that disparate impact and reasonable accommodation are distinct claims). D.W. complains here both of a disparate impact and failure to provide reasonable accommodation to him and other Black children in the proposed Class. *See, e.g.,* Cplt. ¶¶ 22, 46, 47, 50, 52-55, 93, and 100-01. D.W. and the other Black children are worse off than other members of the general public from continuous exposure to gun violence because it affects their ability to engage in major life activities, which "include, but

are not limited to caring for oneself… sleeping, learning, reading, concentrating, thinking, [and] communicating." 29 U.S.C. § 12102(1)(A). Indeed, as the studies show, *see, e.g.,* Cplt. ¶¶ 50-55, children, like D.W. and the other Black children in the proposed Class, directly or indirectly exposed to community gun violence, develop acute or post-traumatic stress disorder, including disrupted sleep and anxiety, as well as reduced awareness and difficulty with concentrating, thinking, and memory, all of which impair cognitive functioning. Accommodation by the ISP having gun dealers employ the Brady Checklist is a prophylactic step that should be taken to avoid discrimination based on disability. *See Wis. Cmty. Serv.,* 465 F.3d at 753 (noting prophylactic steps clearly contemplated).

A disabled child like D.W. suffers this greater injury from continued exposure to a high level of community gun violence, which the state recognizes as engendering a public *health* crisis. The discriminatory impact of Defendant's conduct comes not just from denying the children a degree of public safety that would benefit everyone, but from refusing to accommodate and take steps to ameliorate cascading harm, constantly increasing the extent of the children's disability and leaving them more traumatized and more isolated from their family, friends, and the world.

The concrete gun violence-triggered injuries, including, *inter alia*, PTSD and the disabilities noted above, have been caused, in part, by Defendant's failure to take actions in enforcing reasonable business practices and preventing straw sales. Such often intangible concrete harms or injuries of emotional distress experienced by D.W. and other Black children, as well as the psychological impact leading to their PTSD resulting from ISP's discriminatory treatment, are the concrete types of stigmatic injuries that courts have held sufficient to establish injury-in-fact for Article III standing. *See Allen v Wright*, 468 U.S. 737, 754 (1984) (holding that experiences of discrimination can meet the injury-in-fact requirement for standing). *See also, Satanic Temple v Rokita*, 164 F.4th 1061, 1070 (7th Cir. 2026) (holding concrete stigmatic injuries stemming from discriminatory treatment may constitute an injury in fact) (citing *Allen v. Wright*, 468 U.S. at 754-755).

Accordingly, D.W. and other Black children in the Class have suffered an injury-in-fact, *i.e.,* an invasion of a legally protected interest, from ISP's failure to have gun dealers follow responsible business practices and prevent straw sales of weapons.

### A. Failure to enforce gun dealers' reasonable business practices causes discriminatory impact and denies a reasonable accommodation to D.W. and other Black children.

Contrary to ISPs' representation of the law, *see* Combined Response at 49, Section 504 by its terms protects "any individual," not only those excluded from participation in a program, but also anyone who is otherwise "denied the benefits of … any program or activity," including anyone "subjected to discrimination" under any program or activity. Plaintiff is an individual denied the benefits of a program or activity or subjected to a discriminatory impact in the unjustified way that the program is being carried out.

As the District Court held, the licensing of firearm dealers is a "program" similar to the court's previous finding that the State's Firearm Owner Identification Card system was a "program" under Title II of the ADA. *See, Powell v. Illinois,* No. 18-C6675, 2019 U.S. Dist. LEXIS 168209, at *37 (N.D. Ill. Sept. 30, 2019). It is also a licensing function. Licensing, which is not a law-enforcement function in the criminal-law sense, is a common administrative function of state agencies. It is not unlike other licensing activities conducted by other Illinois agencies that take into account the health, safety, and welfare of the public. Governor

Pritzker's administration has described all gun regulation efforts as part of a state program to address gun violence and has specifically identified activities of the Illinois State Police as part of that program. *See,* Pritzker Press Release, *Mathews v. Illinois,* Case No. 18 C 6675 (N.D. Ill. Aug. 18, 2022) (Press Release). ECF No. 164-1.

As noted *supra,* Section 504 reaches more than intentional discrimination or disparate treatment. *See Wis. Cmty Serv., supra,* 465 F.3d at 752; *Washington v. Indiana High School,* 181 F.3d 840, 846-48 (7th Cir. 1999). Here, Plaintiff has an independent base of liability under Section 504 to challenge a facially neutral rule or policy. First, by the refusal of Defendant to require and enforce gun dealers to employ responsible business practices as part of re-licensing, there is a discriminatory impact on D.W. and other Black children in the class. Plaintiff has already described this special and greater impact, solely by virtue of the disability of Plaintiff and other class members, even though others in these high-crime neighborhoods suffer from exposure to the same level of violence. Everyone in these neighborhoods may be harmed by the refusal of ISP to enforce compliance with the law as part of the re-licensing of gun dealers. But in the case of D.W. and other Black children

with disabilities, the harm is longer-lasting and greater due to continued reinforcement of the disabling trauma. The impact is not equal but disparate, or disproportionately greater, because, as medical literature explains, the fragile condition of these children multiplies the harmful effect. By definition, they are stigmatic injuries.

The ISP has also denied a "reasonable accommodation" to this especially vulnerable population of Black children. The refusal to require responsible business practices, *i.e.*, the abdication of ISP's duty to enforce and protect, is not in accordance with the law. It is impossible for Defendant to justify licensing dealers who fail to have procedures in place, or even to require dealers *to document* that they are in place, when the failure to have such procedures is an "unlawful practice" under the plain language of the law. *See, e.g.,* 815 ILCS 505/2BBBB(b)(1)(A) (stating, among other things, FIRA makes it unlawful to fail to establish or utilize reasonable controls and procedures to prevent a straw purchase). It makes little sense that gun dealers would be exposed to liability under FIRA for such an "unlawful practice," but nonetheless are entitled to a license under FDLCA.

### B. Plaintiff is entitled to enforcement of a licensing program that requires dealers to employ reasonable business practices.

In *Alexander v. Choate*, 469 U.S. 287 (1985), the Supreme Court did not say that it was prohibiting a significant or fundamental change to a program. Rather, the Court's decision precludes a "fundamental alteration in the *nature* of a program." *Id.* at 300 (emphasis supplied). The Court rejected a claim that Tennessee was required to continue offering the same inpatient coverage under Medicaid because any reduction would have a disparate impact on people with disabilities. The Court pointed out that people with disabilities did receive "meaningful" access to the Medicaid benefits, and that there was not an unjustified discriminatory impact. *Id* at 300-02. Here, there is such an unjustified impact: D.W. and other Black children are receiving no meaningful benefit from a method of administration that fails to enforce responsible business practices and prevent straw sales that fuel gun violence to which they are exposed.

Requiring dealers to follow responsible business practices is consistent with the "fundamental nature" of the licensing program. Without question, that program was established to foster responsible business practices by gun dealers. The FDLCA is a broad grant of

authority over the licensing process, and nothing requested here seeks action beyond that authority or contrary to the fundamental nature of the activity authorized by the General Assembly.

It is in the "fundamental nature" of the FDLCA for the ISP to regulate gun dealers, including requiring gun dealers to comply with responsible business practices in the sale of weapons. ISP is required to train gun dealers to employ responsible business practices to ensure that straw sales are not made. This fundamental nature of the statute is a source of understanding the intent of a statute, which the caselaw says courts "must ascertain and give effect" in determining the authority of administrative agencies to '[t]o promulgate rules and regulations necessary for the administration and the enforcement of its powers and duties." *See Zuckerman*, 2012 U.S. Dist. LEXIS 128204, at *10; and *Henry*, 924 N.E.2d at 1130 (quoting *Eastman Kodak Co.*, 426 N.E.2d at 882).

### III.  Plaintiff has Stated a Claim Under the Illinois Civil Rights Act of 2003

Section 5 of the ICRA states that no unit of State shall "utilize criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, national origin,

or gender." 740 ILCS 23/5(a)(2). Plaintiff has identified "criteria or methods of administration," as well as a specific practice, program, or policy that has the effect of subjecting D.W. and other Black children to discrimination because of their color. Specifically, IPS's methods of administration of the FDLCA subject D.W. and other Black children to continuous and increased trauma that causes their disabilities.

Plaintiff is seeking to stop that method of administration and its racially discriminatory impact. As the federal plea agreement and ISP's failure to take any action against gun dealers attests, the ISP does not seriously carry out training of dealers in responsible business practices, as it is obligated to do. The ISP makes no effort to require dealers to comply with the "procedures, safeguards, and practices" that are affirmative obligations under Illinois law. And, when gun dealers are exposed as having made straw sales, the ISP method of administration in response is to relicense them. *See, supra,* at 15.

Cases like *Smith v. City of Jackson*, 544 U.S. 228 (2005), *see* Combined Response at 55, are not even remotely on point or comparable. In *Smith*, the plaintiffs challenged the age disparity in the workforce without explaining its cause, except by citing the overall employment

rules. Here, however, Defendant acknowledges that requiring dealers to follow responsible business practices—a "policy" or "practice"—would reduce the level of gun violence. *See, e.g.,* Opening Brief at 9. n.3 (the "Raoul Amicus"). As the federal criminal plea agreement demonstrates, the ISP instead has a "policy," "program," and "practice" of allowing the dealers to forego responsible business practices, which has resulted in straw sales that fuel violence in high-crime, largely Black neighborhoods where D.W. and other Class members live. Defendant should stop pretending it does not know what "specific" method of administration, policy, program, or practice Plaintiff wants to change, or has a racially discriminatory impact. Anyone who lives in Chicago knows about the problem of lax gun dealers and straw sales or purchases fueling gun violence. It is also clear to anyone living in Chicago that the "specific" method of administration, policy, program, or practice that does not enforce gun dealers to practice responsible business practices in the sale of weapons has a racially discriminatory impact.

The facts here are similar to those in *Central Austin Neighborhood Association v. City of Chicago*, 2013 App (1st) 123041, 1 N.E.3d 976, 377 Ill. Dec. 89 (Ill. App. Ct. 1st Dist. 2013), where the First Appellate District

in Illinois affirmed an ICRA disparate impact claim filed on behalf of minority Chicago neighborhoods. There, plaintiffs alleged the city "use[d] a method of administering responses to 911 calls that has the effect of subjecting the residents of police district populated by mostly African-American and Hispanics to longer waiting periods, on average, for responses to 911 calls." *Id.* at ¶ 10. In reversing the trial court, the Illinois Appellate Court held that "[c]ourts have the power to order appropriate relief for the unjustified disparate impact of a city's administrative practices on certain racial and ethnic groups." Id. at ¶ 28.

The same rationale is applicable here. The ISP's method of administering enforcement of responsible business practices to gun dealers has the effect of subjecting Black children in Chicago to traumatic incidents of gun violence and deaths. As was the case in *Central Austin*, the court in the instant action has the power to order appropriate relief for the unjustified disparate impact of ISP's administrative practices on Black children in Chicago.

IV. Plaintiff has Standing to sue Under the Rehabilitation Act of 1973 and the Illinois Civil Rights Act of 2003

As shown above, Plaintiff has established her claims under the Rehabilitation Act and the Illinois Civil Rights Act, grounded in injuries

sustained by D.W. and other Black children due to ISP's failure to enforce the FDLCA's requirement that gun dealers employ responsible business practices in the sale of guns and their ensuing straw sales. Plaintiff has also demonstrated a causal connection between the injuries and ISP's conduct, *i.e.*, its failure to enforce the law and halt straw sales. Further, Plaintiff has demonstrated the likelihood that D.W.'s and other Black children in the proposed Class's injuries will be redressed or ameliorated, in part or whole, by an order that changes ISP's conduct, *i.e.*, directs it to have gun dealers employ the Brady checklist each time they sell guns. In sum, Plaintiff has satisfied the three "elements" to establish standing in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Contrary to Defendant's, *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), applied the same principles of standing the Court has used since *Lujan*, and broke no new ground. In *Alliance for Hippocratic Medicine*, doctors who claimed "conscience" and "economic" injury from the FDA's failure to regulate the use of a drug by unrelated women to end their pregnancies did not have any "personal" stake in whether the FDA was acting legally. The Court's finding that the doctors lacked any "concrete, particularized" injury in the first place also led the

Court to find lacking any "causation" link back to the FDA's failure to regulate a third party, the manufacturer of Mifeprex. Importantly, the Court did not question that, in principle, a different plaintiff in a different fact situation could suffer a concrete injury from the government's failure to regulate a third party. In affirming the same three factors of injury, traceability, and redressability noted in *Lujan*, the Court stated in no uncertain terms that the analysis of standing in every case is factually unique, especially with respect to a claim of injury from failure to regulate a third party who inflicts injury on the plaintiff. *Id.* at 384 (noting standing is not a "mechanical exercise," and that causation is" heavily fact-dependent"). Accordingly, "the causation requirement and the immanence of the injury-in-fact requirement can overlap," with a common target: "*Is it likely that the government regulation or lack of regulation of someone else will cause a concrete and particularized injury in fact to the unregulated plaintiff?*" *Id.* n. 2 (emphasis supplied).

Here, the answer is in the affirmative. Defendant has clear authority to regulate gun dealers, and such regulation would have a determinative and coercive effect on the ability of third parties, *i.e.*, gun dealers, to continue ignoring or not following responsible business

practices. Such regulations would reduce the number of illegal guns and the level of violence.

This approach to analyzing traceability was established in *Bennett v. Spear,* 520 U.S. 154 (1997), where the Court held that a government agency's opinion on an environmental issue would have a coercive effect on a third party not before the Court. *Id.* at 170-71. The Court cautioned against being too strict in denying standing in such cases holding, "While, as we have said, it does not suffice if the injury complained of is '[the] result [of] the *independent* action of some third party not before the court,' *Lujan, supra,* at 560-561 (emphasis added) . . . that does not exclude injury produced by determinative or coercive effect upon the action of someone else." *Bennett,* at 169. The Court has reiterated the same principle recently finding standing when the plaintiff's harm "does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties." *Department of Commerce v. New York,* 588 U.S. 752, 768 (2019) (citing *Bennett,* 520 U.S. at 169-70).

Applying those principles supports standing here. The standing analysis starts with the existence of a concrete injury-in-fact. One cannot

honestly compare the traumatic injuries to D.W. from the shooting death of his cousins to repeated exposure to daily gun violence with the nebulous and, as the Court noted, "speculative" and "attenuated" injury claimed by the doctors in *Alliance for Hippocratic Medicine*.

Justice Kavanaugh noted that, "As Justice Scalia memorably said, Article III requires a plaintiff first to answer the question, 'What's it to you?'" 602 U.S. at 379. No credible person would dare ask D.W. and other Black children in Chicago, "What's it to you?" In the first four months of 2026, Chicago has recorded 73 juvenile homicides, 19 fatal. *See* City of Chicago, Mayor's Office of Violence Reduction (2026), https://www.chicago.gov/city/en/sites/vrd/home.html. Black children are terrorized by gun violence and afraid to leave their homes. The injury-in-fact suffered by D.W. is real and worsens as gun violence persists.

Federal courts have applied *Bennett* to ask whether the government has clear regulatory authority over a third party and whether the regulation sought would have "determinative or coercive effect" on the third party's actions. *See, e.g., WildEarth Guardian v. United States Forest Service,*70 F.4th 1212, 1217 (9th Cir 2023). ISP has that clear authority. FIRA requires dealers to use responsible

business practices to prevent illegal straw sales. The FDLCA authorizes the ISP to withhold license renewal for "violations of… any law applicable to the sale or transfer of firearms." 430 ILCS 5-85. Nothing could be more "determinative" in stopping that third party from making straw sales. Moreover, as the Raoul Amicus, *supra* at 24, notes, requiring dealers to follow responsible business practices at the time of sale will appreciably reduce gun violence. *See also* Cplt. ¶¶ 73-80 (citing Raoul Amicus and expert testimony of Dr. Daniel Webster cited therein, opining that responsible business practices reduce gun violence).

Having gun dealers use the Brady Checklist will ensure responsible business practices and reduce the level of gun violence in Chicago neighborhoods where D.W. and other Black children live. This conclusion is consistent with other courts that have addressed the issue in the context of manufacturers and distributors of weapons to gun dealers. *See e.g., National Association for the Advancement of Colored People v. Acusport, Inc.*, 271 F. Supp. 2d 435, 450 (E.D.N.Y. 2003) (noting that dealers who sell guns responsibly would prevent straw sales).

In sum, applying the *Bennet* analysis demonstrates that regulation requiring responsible business practices will have a determinative or

coercive effect on the sale of guns, which the Attorney General, experts, and other jurists recognize will lessen gun violence. Thus, Plaintiff has shown how D.W.'s and other Black children's injuries are traceable to the ISP's failure to enforce the FDLCA, and how ordering ISP to have gun dealers employ the Brady checklist will prevent straw gun sales, which will lessen gun violence in Chicago neighborhoods and ameliorate D.W's and other Black children's disabilities.

## CONCLUSION

For the reasons stated herein, in the Plaintiff's Opening Brief, and in open court, Plaintiff-Appellant/Cross-Appellee asks this Court to reverse the District Court's decision and remand for further proceedings consistent with its decision.

Dated: May 4, 2026

Respectfully submitted,

/s/ Thomas H. Geoghegan
Attorney for Plaintiff-Appellant

Thomas H. Geoghegan
Will W. Bloom
**DESPRES, SCHWARTZ, & GEOGHEGAN, LTD.**
77 West Washington Street, Suite 711
Chicago, Illinois 60602
Tel.: (312) 372-2511
tgeoghegan@dsgchicago.com

Patrick V. Dahlstrom
**POMERANTZ LLP**
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Tel.: (312) 377-1181
pdahlstrom@pomlaw.com

**Attorneys for Plaintiff-Appellant**

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE LIMITATIONS

1.      This brief complies with the type-volume limitation of Seventh Circuit Rule 28.1 as the brief contains 6,958 words, excluding parts of the brief exempted by Fed. R. App. R. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P, 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) as the brief has been prepared in a proportionately spaced typeface using Microsoft Office Word in 14-point Century font.

Dated:  May 4, 2026                          /s/ Thomas H. Geoghegan
                                             Attorney for Plaintiff-Appellant

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that the foregoing document was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit and served on all parties of record through the Court's CM/ECF system on May 4, 2026. Parties of record may obtain a copy through the Court's ECF system.

/s/ Thomas H. Geoghegan
Attorney for Plaintiff-Appellant